## LINE v. ERIE R. CO.
### No. 6047.

Circuit Court of Appeals, Sixth Circuit.
Jan. 20, 1933.

C. A. Meck, of Toledo, Ohio (Meck & Meck, of Toledo, Ohio, on the brief), for appellant.

E. A. Foote, of Cleveland, Ohio (McGowan, Foote, Bushnell & Burgess, of Cleveland, Ohio., on the brief), for appellee.

Before MOORMAN, HICKS, and HICKENLOOPER, Circuit Judges.

HICKS, Circuit Judge.

Cora E. Line, executrix of the estate of Charles Homer Line, sued the Erie Railroad Company, appellee, for damages for the alleged wrongful death of deceased. The case was brought under, and falls within, the Federal Employers' Liability Act (April 22, 1908, c. 149, § 1, 35 Stat. 65, tit. 45, c. 2, § 51, U. S. C. [45 USCA § 51]). The trial judge directed a verdict for appellee.

The undisputed evidence is that on the night of February 3, 1929, appellee's train No. 82, consisting of the engine, seventy-two or seventy-three box cars, and the caboose, left Marion, Ohio, east bound for Kent, Ohio. The crew was composed of the deceased as conductor, Engineer Mason, Fireman Weiss, Flagman Hastings, and Head Brakeman Carder. After passing Ashland at about 1:40 a. m., the train proceeded eastwardly to Ashland hole, when the air went on, stopping it. After the train had stopped the caboose and one car stood west of Jerome Fork Bridge. Each car was forty-two feet long over all and the head of the train was therefore approximately three thousand feet eastward. Deceased sent Hastings back to flag and to telephone the trouble to the Ashland dispatcher, and then walked forward, meeting Head Brakeman Carder near the center of the train. They were both looking for the cause of the trouble, and neither having found it, they returned together to the caboose where deceased procured an air hose and a lighted lantern. The two then went forward again and began an inspection, Carder being about a car length in advance of deceased. Carder found a broken crossover pipe under the tenth car from the head and while he was releasing the air from it deceased came up and said, "I see you found the trouble." Carder replied, "Yes." Deceased then said: "Second No. 4 is coming pretty close behind us. I want you to go over to the engine and have him call the flagman." Carder went forward and deceased turned as if to return to the caboose. He was not thereafter seen alive.

Upon receiving the orders of deceased, through Carder, the engineer called in Flagman Hastings by the usual signal, i. e., four blasts of the whistle. After several minutes the train started and deceased was struck and killed by some portion of it. His body was found lying between the rails of the eastbound track. His chest was crushed as if he had been rolled. One foot was cut off and the other crushed. The only blood found was where this foot had been cut off which was at the point where the body lay.

When the train reached West Salem it was stopped again. The brake rigging was down on one of the cars and was there removed. The record does not clearly disclose the particular car that had this defect, but the more persuasive evidence is that it was the thirty-sixth from the engine. Since the train consisted of about seventy-two cars, the car would have been approximately the thirty-sixth from the caboose also.

By rule 591 the engineer was forbidden to start the train without receiving the customary signal from the conductor.

The gravamen of the action is that the engineer started without such signal, when the deceased was under the thirty-sixth car either repairing or removing the defective brake rigging.

As the train stood at Ashland hole the thirty-sixth car would have been approximately fourteen hundred and twelve feet east of Jerome Fork Bridge. There was naturally some divergence of opinion as to the exact spot where the body was found because those searching for it in the night (about 3 a. m.) were more interested in finding it than in determining its location. But there was substantial evidence that it was found about a quarter of a mile east of the bridge. There was also evidence that it was found a little nearer to Jerome Fork Bridge than to Stanch's crossing, the next highway crossing to the east. The distance from Jerome Fork Bridge to Stanch's crossing was three thousand seven hundred eighty-six feet. Either of these points would have been quite near the thirty-sixth car as the train stood at Ashland hole.

There was evidence that a short distance, possibly ten feet, west of the body, a wrench and an air hose were found lying between the east and west bound main tracks and that deceased's cap was also nearby. Deceased did not have a wrench when he separated from Carder at the tenth car but he had had sufficient time to go to the caboose for one and return before the train started. The evidence tends to show that it was unnecessary to use a wrench to raise a fallen brake rigging

but it was probably necessary to use one in removing the rigging altogether. A short distance west of the air hose the deceased's lantern, unlit, was found sitting on the ballast between the rails of the east-bound track. It was upright though slightly inclined from the perpendicular. Its bottom ring was bent but there was evidence that this was an old bend; otherwise the lantern was in good condition for it was used by deceased's successor on the same night, after the accident.

We think that this evidence, though circumstantial, is sufficient, if believed by the jury, to sustain a verdict in appellant's favor. Western & Atl. R. R. Co. v. Hughes, Adm'x, 278 U. S. 496, 498, 49 S. Ct. 231, 73 L. Ed. 473. The evidence was more than a scintilla. Hardy-Burlingham Min. Co. v. Baker, 10 F.(2d) 277 (C. C. A. 6); Begert v. Payne, 274 F. 784, 788 (C. C. A. 6). It carried a justifiable rather than a mere possible inference (American Oil Co. v. Frederick, 47 F.(2d) 54, 57, C. C. A. 6) that when the engineer started the train the deceased was under it and could not therefore have given the signal to proceed. Under the rules it was the duty of the conductor to inspect the train on his return from the tenth car to the caboose and if he found a brake rigging down on the thirty-sixth car under rule 520 it was his duty to see that it was removed and the jury might reasonably have concluded that at the time he was killed deceased was under this car performing that duty.

Appellee introduced evidence tending to show that deceased gave the usual starting signal by lantern from the top of the train somewhere near the thirty-fifth or fortieth car from the engine, and contends that after the train started deceased fell between two of the cars to the track below.

It will be noted that this is not a serious contradiction of appellant's evidence as to the whereabouts of deceased relative to car 36 at the time he was struck, but it does contradict the inference that he was under the car when the train started. As such it is of no consequence in determining the correctness of a directed verdict. Gunning v. Cooley, 281 U. S. 90, 94, 50 S. Ct. 231, 74 L. Ed. 720; Richmond & Danville R. Co. v. Powers, 149 U. S. 43, 47, 13 S. Ct. 748, 37 L. Ed. 642; Rochford v. Penna. Co., 174 F. 81, 83 (C. C. A. 6); Minneapolis, St. Paul, etc., Ry. Co. v. Galvin, 54 F.(2d) 202 (C. C. A. 6); Begert v. Payne, supra; Howard v. Louisiana & A. R. Co., 49 F.(2d) 571 (C. C. A. 5).

That deceased fell is only an assumption on the part of the appellee and is much weak-

ened by the physical facts. Deceased weighed about two hundred pounds, and if in a fall his body had cleared the coupler the inference is that it would have fallen across a rail rather than between the rails and would have been mangled. We do not think that the evidence indicating that deceased gave the starting signal and fell after the train started does, as a matter of law, destroy the effect of appellant's evidence touching the defective brake rigging on car 36, the upright position of the lantern and its undamaged condition, the location and physical condition of the body and the relative location of the deceased's cap, the wrench and the air hose.

Judgment reversed.