FARMERS & GINNERS COTTON OIL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 93436.   Promulgated May 8, 1940.

*E. L. All, Esq., A. J. Bowron, Jr., Esq.,* and *Virden Moore, Esq.,* for the petitioner.

*Stanley B. Anderson, Esq.,* for the respondent.

## OPINION.

MURDOCK: The question here is substantially the same as that considered in the case of *Ben Grote*, 41 B. T. A. 247. The only purpose which the petitioner had in buying the futures in refined oil was to attempt to avoid loss upon the crude oil which it was manufacturing. This method was as effective a hedge against loss on its operations as was available to the petitioner. Its raw material was cottonseed, but there was no futures market for that and no hedge could be made by purchases thereof. It did not buy the futures merely as a speculation, but solely to replace its manufactured product which it was forced to sell at a price which it deemed unsatisfactory. All of the transactions were directly related to its business of production and sale. The question of whether or not it could have inventoried the contracts for future delivery of refined oil need not be decided. Cf. G. C. M. 18658, C. B. 1937-2, p. 77. We pointed out in the *Grote* case that the Commissioner has interpreted and administered section 117 as excluding hedging transactions, citing G. C. M. 17322, C. B. XV-2, p. 151. The facts in this case disclose no satisfactory basis for distinguishing it from the *Grote* case and on that authority we hold that the petitioner is entitled to a deduction of $24,024.30 as losses sustained in connection with its business for the taxable year.

This opinion supersedes that promulgated on February 6, 1940, 41 B. T. A. 255.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

---

HILL, dissenting: I am unable to agree with the conclusion reached in the majority opinion. The business of petitioner was the operation of a cottonseed oil mill. That business was confined to buying and

crushing cottonseed and selling the products derived therefrom, including crude cottonseed oil. Petitioner's business did not include the processing of crude into refined oil. Its dealings in futures contracts for refined oil were transactions involving mere investment in, and sale of, capital assets having no identity with the products manufactured by petitioner. Refined oil is a distinct and separate commodity from crude oil, notwithstanding the latter is an intermediate source of the former. The manufacturing operations of petitioner did not extend to the production of refined oil and its business operations were completed when it sold the products it manufactured.

Petitioner contends that the initial processing of crude oil is so related to the manufacture of refined oil as to make stocks of the latter product invoiceable as regular "stock in trade" of the processor. It further contends that its transactions in refined oil futures were essentially a part of a process of production or other acquisition of property for sale to customers in the ordinary course of its trade or business.

The first of these contentions has no factual basis of application in this proceeding. Petitioner had no refined oil to invoice either as stock in trade or otherwise and the evidence herein discloses that its intention in dealing in refined oil futures was not to take delivery of oil, notwithstanding it could have demanded and received delivery under the terms of the futures contracts. Its transactions in refined oil futures were merely executory contracts to purchase, which it acquired with a positive intent not to close into completed purchases and not to acquire any commodity thereby.

The second of the above cited contentions of petitioner is (a) that its transactions in refined oil futures were a part of a process of production or (b) other acquisition of property for sale to customers in the ordinary course of its trade or business. As to subdivision (b) of this contention, attention is directed to the fact that by the purchase of such futures contracts the only property acquired was the contracts, which were bought and sold through brokers on petitioner's own account only and not for customers. They were merely choses in action and represented neither stocks of oil nor any other commodity includable in an inventory of stock in trade. By subdivision (a) of such second contention petitioner obviously means that its transactions in refined futures contracts were a part of the process of production of crude oil. The gist of its supporting argument on this point is that transactions in such futures contracts were necessary to enable petitioner to maintain its position in the oil market, due to the fact that rapid deterioration of crude oil compels its sale shortly after production, regardless of the state of the market. Since, as is found, there is a direct relationship between the market price of crude and refined oil, the purpose of petitioner in maintaining a position in the oil market by purchasing refined oil futures is to enable it to indulge in the specu-

lation that at some future time there may be a better market for oil than when it sold crude. Such speculation also involves, of course, the risk that instead of improving, the market price may descend to a still lower level. If, as is argued for petitioner, its purpose in buying refined oil futures was to maintain the same position it would have had in the oil market if it had not been forced to sell its crude oil on an unsatisfactory market, it failed to accomplish that purpose.

The purchasing of futures contracts at or following the times of corresponding sales of crude oil did not operate as an unbroken maintenance of petitioner's position in the oil market. It left a hiatus between the dates of sales of crude oil and the delivery dates of the futures contracts. Hence, it can not be said that the futures contracts accomplished the purpose which petitioner acclaimed, namely, to maintain its position in the oil market. That purpose could have been effectuated by purchasing spot refined oil at the related market prices at the times of corresponding sales of crude oil and by adding such refined oil to its inventories and to its stock in trade for sale to its customers in the ordinary course of trade or business. That, however, would not have been insurance or protection against investment risks. It would have afforded only an opportunity for speculation on future oil prices. But such stocks of refined oil would not have been within the classification of capital assets and any losses resulting in respect thereof would have been deductible in full for income tax purposes. This course would have at least continued petitioner's status in the oil market on the same relative price basis as if it had been able to hold its crude oil. Since petitioner did not adopt this course it can not successfully contend that its purpose was to replace crude oil with refined oil. Petitioner did not seek to maintain its position in the oil market through the replacement of inventories of crude oil with those of refined oil but first closed out its investment in its crude oil inventories and thereafter made corresponding purchases of refined oil futures contracts which bore no protective relationship to any existing or prospective investment risk. Furthermore, the market prices at which the futures contracts were purchased were the then present prices of future deliveries and had no relation to the market prices at which the corresponding sales of crude oil were made. The purchases of such futures contracts were, therefore, wholly speculative transactions. In view of the purely speculative character of all transactions in futures contracts (except as hedges), it appears to me that, unless such futures contracts constitute hedges against petitioner's business investment risks, they can not be said to be a part of petitioner's process of production.

Petitioner does not claim that its transactions in futures contracts possessed all of the elements of a hedge, but it claims that they had a protective purpose and relationship to its business and operations.

It is my opinion that such transactions had none of the elements of a hedge and in no way afforded insurance or protection against petititioner's existing or prospective investment risks, either in its raw materials or its crude oil. The purchase of such futures contracts operated only to create new and additional investments, fraught with new and additional investment risks, without any counterbalance of a hedge.

The statute has no provision excluding hedging transactions from the operation of the provisions of section 117 of the Revenue Act of 1934, but the Treasury Department has construed such section as excluding from its operation hedging transactions. G. C. M. 17322, C. B. XV-2, p. 151. The discussion and illustration of hedges set forth therein do not include, as constituting a hedge, the state of facts in the instant proceeding. Two examples are given therein as illustrating typical situations in which protection is obtained by the use of hedging transactions, as follows:

(1) The taxpayer buys quantities of spot cotton, which will necessarily be on hand for some months before being manufactured into goods and sold. In order to be protected against losses which would be incurred if the cotton market declined during those months, the taxpayer, at the same time the above purchases are made, enters into futures sale contracts for the delivery of equivalent amounts of cotton a few months hence. As the above quantities of spot cotton are subsequently disposed of by sales from time to time of manufactured cotton goods, the above futures sale contracts are concurrently disposed of by futures purchase contracts which serve as offsetting transactions closing out the futures sale contracts.

(2) The taxpayer makes contracts for future delivery of cotton goods, the manufacture of which will require more cotton than the amount on hand or the amount which can be immediately purchased advantageously. In order to secure protection against a rising cotton market during the months that intervene between the date of the order for cotton goods and the agreed delivery date, the taxpayer, at the same time the above orders are taken, enters into futures purchase contracts for cotton in amounts necessary to provide the desired protection. As the taxpayer from time to time buys spot cotton for the manufacture of the goods specified in the above orders, the futures purchase contracts are disposed of by futures sale contracts which serve as offsetting transactions closing out the futures purchase contracts.

\*　　\*　　\*　　\*　　\*　　\*　　\*

The last paragraph of the cited G. C. M. is as follows:

It follows from the above that hedging transactions are essentially to be regarded as insurance rather than a dealing in capital assets within the comprehension of section 117 of the Revenue Act of 1934. Regardless of accounting or inventory methods in use, provisions pertaining to capital gains and losses govern gains or losses on futures contracts which are speculative. Futures contracts representing true hedges against price fluctuations in spot goods are not speculative transactions, though not concurrent with spot transactions. Futures contracts which are not hedges against spot transactions are speculative unless they are hedges against concurrent futures or forward sales or purchases.

Under the interpretation set forth in the cited G. C. M. the futures contracts in the instant proceeding would not be includable in petitioner's inventories if on hand at the end of the taxable year, for the reason that they are not hedges against actual spot or cash transactions or against forward sales or purchases, as evidenced by a quotation with approval therein from S. M. 5693 (C. B. V–2, p. 20) as follows:

(2) That cotton and grain dealers should incorporate in their balance sheets at the close of the taxable year at market such open future contracts to which they are parties as are hedges against actual spot or cash transactions or against forward sales or purchases, as the case may be; provided, that no purely speculative transactions in futures not offset by actual spot or cash transactions or concurrent forward purchases or sales may be so included or taken into the taxpayer's account in any manner until such transactions are actually closed by liquidation; and provided further, that the values of the commodity covered by such open future contracts shall not be added to or deducted from the inventory of the taxpayer.

In order for petitioner to avail itself of the protective principle of a hedge as that principle is illustrated and enunciated in the cited G. C. M., it must use as a basis the investment risk involved in the cost of its raw material, namely, cottonseed, and relate its futures purchases to that basis. After the manufacturing processes are complete and the resulting product sold, there remains no investment risk against which to hedge.

It is my opinion that petitioner's dealings in futures contracts were not in any sense hedging transactions, and by the very circumstances under which they were consummated they could not possibly be other than purely speculative and could not furnish protection against petitioner's business or investment risks. A hedging transaction is not speculative and eliminates *pro tanto* the speculative character of the investment hedged. It operates as insurance or protection against the investment risk of future loss and must be entered into for operation covering the period of such risk and terminate therewith. A hedging transaction and the investment protected thereby coexistingly operate upon each other. If a gain is realized on the hedging transaction it is counterbalanced either by a realized loss or by some other character of economic disadvantage in respect of the investment hedged. If a loss is realized in the former it is counterbalanced by a realized gain or some other character of economic advantage in respect of the latter. As a result of the counterbalancing effect between the hedging transaction and the investment protected thereby, speculation as to either gain or loss is eliminated.

It is said in the majority opinion:

* * * The only purpose which the petition had in buying the futures in refined oil was to attempt to avoid loss upon the crude oil which it was manufacturing. This method was as effective a hedge against losses on its operations as was available to the petitioner. * * *

It is my opinion, as hereinabove pointed out, that it was not a hedge and was not of such character as to be effective to accomplish petitioner's claimed purpose. If, however, petitioner's transactions in refined oil futures contracts be deemed a hedge for tax purposes, petitioner with equal logic and effectiveness could have created a hedge by purchasing wheat futures contracts or futures contracts in respect of any other commodity listed on the produce exchange. This illustration is employed merely to indicate the wide open spaces revealed in the majority opinion. The opinion of the Board in this proceeding cites the case of *Ben Grote*, 41 B. T. A. 247, as authority for its conclusion. Regardless of whether the *Grote* case, on its facts, supports the conclusion reached by the majority in this case, it is my opinion that the *Grote* decision is glaringly erroneous. I dissented from it. The opinion in the *Grote* case did not discuss the question of what constitutes "hedging transactions." It merely said "the evidence shows that petitioner's transactions were all hedging transactions." Aside from that terse *ipse dixit*, no reasons are assigned for the conclusion therein reached.

Subdivision (b) of section 117, *supra*, defines as "capital assets" all property held by a taxpayer except (1) stock in trade of the taxpayer, (2) other property which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, and (3) property held by the taxpayer primarily for sale to customers in the ordinary course of business.

Regardless of whether petitioner's transactions in such futures contracts constituted a trade or business or were entered into for profit, such contracts were nevertheless capital assets within the above statutory definition. They were choses in action, bought and sold only on a produce exchange through brokers. They were bought and sold by petitioner on its own account only, and not for customers. It held no oil futures contracts in stock for sale to customers and, therefore, had no right to include them in an inventory. Cf. *Francis M. Weld*, 31 B. T. A. 600; *Adirondack Securities Corporation*, 23 B. T. A. 61; *Oil Shares, Inc.*, 29 B. T. A. 664; *O. L. Burnett*, 40 B. T. A. 605; *Staerker* v. *United States* (U. S. Dist. Ct., N. Dist. of Texas, Sept. 23, 1938).

Accordingly the losses involved in this proceeding were capital losses and the deduction thereof should be limited as prescribed in subdivision (d) of section 117, *supra*.

LEECH and HARRON agree with this dissent.

---

MELLOTT, dissenting: The case of *Ben Grote*, 41 B. T. A. 247, which I feel was decided correctly, does not support the conclusion of the majority in the instant proceeding. It approves an administrative

ruling (G. C. M. 17322, C. B. XV-2, p. 151)—which it may be is not bottomed upon any specific statutory provision—authorizing the deduction of losses in connection with "hedging" operations as "a legitimate form of business insurance."

I agree with much that is said by Mr. Hill in his dissenting opinion. It is obvious that petitioner's dealings in futures in refined oil did not constitute true "hedging" operations in its business. Hedging "is a means by which collectors and exporters of grain or other products, and manufacturers who make contracts in advance for the sale of their goods, secure themselves against the fluctuations of the market by counter contracts for the purchase or sale, as the case may be, of an equal quantity of the product, or of the material of manufacture." *Board of Trade* v. *Christie Grain & Stock Co.*, 198 U. S. 236, 249. In *United States* v. *Coffee Exchange*, 263 U. S. 611, 619, the Court refers to one of the classes who deal in "futures" as "those who use them to hedge, i. e., to insure themselves against loss by unfavorable changes in price at the time of actual delivery of what they have to sell or buy in their business." The examples given in the G. C. M. indicate that when the Commissioner used therein the term "hedging" he had in mind the Court's definition. I would limit the applicability of the ruling to one who has made a counter contract for the purchase or sale of an equal quantity of the product manufactured or raised, or of the material going into the manufacture of it.