COMMISSIONER OF INTERNAL REVE-
NUE v. FARMERS & GINNERS
COTTON OIL CO.
No. 9802.

Circuit Court of Appeals, Fifth Circuit.
June 9, 1941.
Rehearing Denied July 17, 1941.

---

HUTCHESON, Circuit Judge, dissenting.

———◇———

Edward H. Hammond and Sewall Key, Sp. Assts. to Atty. Gen., Samuel O. Clark, Jr., Asst. Atty. Gen., and J. P. Wenchel, Chief Counsel, Bureau of Internal Revenue, and C. R. Marshall, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for petitioner.

Lee C. Bradley, Jr., and A. J. Bowron, Jr., both of Birmingham, Ala., for respondent.

Before FOSTER, HUTCHESON, and HOLMES, Circuit Judges.

HOLMES, Circuit Judge.

The question for our decision is whether losses which the taxpayer sustained on contracts for future deliveries of refined cottonseed oil were capital losses under Sec. 117(d) of the Revenue Act of 1934, 26 U.S. C.A. Int.Rev.Acts, page 708, or ordinary and necessary business expenses under Sec. 23(a) of said act, 26 U.S.C.A. Int.Rev.Acts, page 671.

The respondent taxpayer is a corporation. It buys cottonseed, crushes it, and sells the products derived therefrom. One of such products is crude cottonseed oil, which deteriorates rapidly, especially in warm weather. The respondent's storage facilities for crude oil are not more than one-sixth of its annual production, and larger storage facilities would be uneconomical. Because of these circumstances, respondent does not retain its crude oil until it can obtain what it regards as a favorable price, but sells during the operating season at the market price whenever its storage tanks are full. When forced to sell its crude oil at prices which it deems unsatisfactory, it is respondent's practice to buy, on margins, refined oil for future delivery, which later it sells before the delivery date.

There is no futures market for crude oil, but there is a direct relationship in the market price between the crude and the refined oil. The market price of the former is determined in large part by the market price of the latter plus freight to the refinery, the cost of refining, the loss in refining, and such other expenses, if any, as are incident to the operation of converting crude into refined oil. The customary practice followed by respondent during the tax year was first to sell the crude oil at the prevailing market price, and then to place orders with brokers to purchase futures on a produce exchange. If orders could not be filled readily at the price designated by respondent, the orders were carried until purchases could be made at such prices. Such purchases were sometimes made weeks later than the corresponding sales of crude.

Crude oil loses about nine per cent in weight in the process of being refined. In the fiscal year ending June 30, 1936, petitioner sold 2,940,000 pounds of crude oil at prices unsatisfactory to it, and made purchases of 2,760,000 pounds of refined-oil futures. 2,760,000 pounds of refined oil is the approximate equivalent in pounds of 3,033,000 pounds of crude oil. The quantity unit, both in the transactions in crude and refined oil, is a tank of 60,000 pounds. During the taxable year the market price of crude oil averaged approximately nine cents a pound, or $5,400 per tank. Re-

fined-oil futures were bought on margins of about $300 per tank. Petitioner could have demanded delivery of refined oil under any futures contract, but made no such demand, and the contracts were entered into by it with the intention not to demand or receive such delivery. Its transactions in this respect consisted entirely of purchases and sales of refined oil for future delivery, the contracts for which were terminated before the date agreed upon for delivery. Futures contracts for refined oil require no investment for storage, transportation, or insurance. Accordingly, about $300 per tank plus brokerage commissions constituted petitioner's initial investment under the futures contracts.

The Board found that transactions in such commodity for future delivery were entered into by respondent solely as a protective measure against sales of crude oil which it was compelled to make at prices deemed unsatisfactory, since it was able to maintain a position in respect of future market conditions of refined oil which it was powerless to maintain in respect of crude oil; that such futures contracts were bought and sold only on produce exchanges through brokers, and that petitioner had no customers of its own in respect thereof; that such contracts were not stock in trade, and were not property held by respondent primarily for sale to customers in the ordinary course of its trade or business.

In the taxable year, petitioner sustained a loss of $24,024 in its transactions in refined oil, bought and sold for future delivery, and deducted the amount of such loss from its gross income. The petitioner contends that the losses in question resulted from the sale of capital assets, and disallowed as a deduction so much thereof as exceeded $2,000 plus capital gains. Respondent contends that the losses it sustained in such dealings in refined oil were normal business losses. The claim is based primarily on the hypothesis that the initial processing of raw cottonseed is so related to the manufacture of refined cottonseed oil as to make stocks of the latter product invoiceable as regular "stock in trade" of the processor. Secondarily, it contends that, in any event, its dealings in oil futures were transactions entered into for profit,

and that the resulting losses are deductible, under Sec. 23(f) of the Revenue Act of 1934, as having been sustained during the taxable year and not compensated for "by insurance or otherwise."

■ The petitioner concedes respondent's loss, but contends that its investments in refined oil for future delivery were capital assets within the definition set out in paragraph (b) of Sec. 117 of the Revenue Act of 1934. Losses on commodity exchanges from dealings such as these may be said to fall into three general classes: hedges, wagering contracts, and legitimate capital investments.[1] Losses from true hedges are allowed in full.[2] Wagering losses are allowed only to the extent of gains from wagering contracts.[3] Capital losses are allowed only to the extent of $2,000 plus the gains from sales or exchanges.[4] In this case[5] the Board allowed the full amount as true hedging losses, citing its decision in Grote v. Commissioner, supra. There is no claim that these were wagering contracts; it would not help respondent if they were; and the presumption is that they were not. We have this day held that losses from executory commodity futures-contracts were capital losses.[6] Therefore, we need only examine the contention of the taxpayer, which was upheld by the Board, that the losses in controversy resulted from true hedges.

■ A hedge is a form of price insurance; it is resorted to by business men to avoid the risk of changes in the market price of a commodity. The basic principle of hedging is the maintenance of an even or balanced market position. To exercise a choice of risks, to sell one commodity and buy another, is not a hedge; it is merely continuing the risk in a different form. That is what the taxpayer did in this case. It did not retain its crude oil and sell refined; it sold crude and bought refined when it had no actual commodity on hand or future commitments to be protected from price variations.

■ Conceding that there is a price relation between crude and refined oil, the respondent merely exchanged its market risk from crude to refined. It may have sold crude at prices which were unsatisfactory

[1] United States v. Coffee Exchange, 263 U.S. 611, 619, 44 S.Ct. 225, 68 L.Ed. 475.

[2] Grote v. Commissioner, 41 B.T.A. 247.

[3] Sec. 23(g), Act of 1934, 48 Stat. 689,

26 U.S.C.A. Int.Rev.Acts, page 672.

[4] Sec. 117(d), Act of 1934, 48 Stat. 715, 26 U.S.C.A. Int.Rev.Acts, page 708.

[5] 41 B.T.A. 1083.

[6] Commissioner v. Covington, et al., 5 Cir., 120 F.2d 768, decided June 9, 1941.

to it, but the purchase of refined gave it no price insurance against future fluctuations in the market. The respondent was not a manufacturer of refined oil. It had no crude or refined oil on hand when it bought or sold the futures from which the losses in controversy were incurred. These losses did not result from true hedges, and the decision of the Board of Tax Appeals is reversed.

HUTCHESON, Circuit Judge, dissents.