Trenton Cotton Oil Company v. Commissioner.
Trenton Cotton Oil Co. v. Commissioner
Docket No. 110950.
United States Tax Court
1943 Tax Ct. Memo LEXIS 13; 2 T.C.M. (CCH) 1172; T.C.M. (RIA) 43532; December 28, 1943
*13 Robert P. Adams, Esq., and Taylor E. Cress, C.P.A., for the petitioner. Charles P. Bagley, Esq., for the respondent. MELLOTT
Memorandum Findings of Fact and Opinion MELLOTT, Judge: The Commissioner determined the following deficiencies in tax: Fiscal Year
Excess
Ending
Income Tax
Profits Tax
August 31, 1939
$1,773.07
August 31, 1940
9,780.50
$5,163.92
Some of the adjustments are not contested. One issue raised by the pleadings involves an expenditure of $65.40 which the respondent determined was a capital expenditure. No evidence was adduced upon this issue. All other charges of error arise from the respondent's treatment of petitioner's dealings in futures for cottonseed oil. Summarizing the charges of error petitioner contends that the respondent erred: (a) in determining that its losses from such dealings in futures were not losses from "hedging" but were capital losses; (b) in determining that each transaction on the Commodity Exchange resulted in taxable gain or loss; and (c) in determining that such losses were not losses from "Wash Sales" (Section 118 Revenue Act of 1938). Findings of Fact Petitioner is a Tennessee corporation located at Trenton, Tennessee. *14 Its books are kept and its returns are made on a fiscal year basis beginning September 1 and ending August 31. Its returns for the taxable years were filed with the collector of internal revenue for the district of Tennessee. In the taxable years and for many years prior thereto petitioner was engaged in the business of operating a cottonseed oil mill for the production of crude cottonseed oil and by-products, consisting principally of cottonseed meal, cottonseed hulls and linters. The business of crushing cottonseed oil is seasonable, beginning about the middle of September and continuing for six or seven months. During the taxable years petitioner had two cottonseed storehouses having a capacity of between 9,000 and 10,000 tons. It purchases and crushes approximately 11,000 tons of cottonseed a year. During the crushing season it always has a substantial quantity of cottonseed on hand. Crude cottonseed oil deteriorates rapidly, especially in warm weather, and has to be refined shortly after it is produced. Petitioner had no facilities for refining crude oil and its storage capacity for crude oil was quite limited, being only approximately 4 1/2 tanks, equivalent to approximately *15 2 weeks' production. It is impractical either to store the crude cottonseed oil, or, in a small mill like petitioner's, to have it refined. Petitioner's purchases of cottonseed are not all made at one time. Most of its seed is purchased from ginners in quantities of approximately 100 tons at a time. The cottonseed is bought on grade at a "basis" price which is subject to adjustment when the seed is analyzed and graded upon delivery. Petitioner also, in advance of the cotton season, frequently makes loans to ginners in order to get their cottonseed. When such loans are made it is understood that the ginners will offer their seed to petitioner at market before disposing of it elsewhere; but petitioner is not thereby committed to purchase any quantity of such seed. As petitioner purchases cottonseed it determines the quantity and grade of crude oil which will be produced therefrom and usually sells the oil for delivery as produced at a fixed price. In the season 1938-1939 petitioner produced 67 tanks of crude cottonseed oil. At the beginning of the season the price was unsatisfactory and was recognized by petitioner and its officers and stockholders to be unsatisfactory. The situation *16 was discussed by petitioner's officers and its 7 stockholders and decision was reached to purchase on margin on the Commodity Exchange substantially an equal number of tanks of refined oil for future delivery. It was agreed that petitioner would maintain its "long" position in refined cottonseed oil until such time as the prices for its crude cottonseed oil became satisfactory. There is no futures market for cottonseed or for crude cottonseed oil. Under the rules of the Commodity Exchange futures contracts for refined cottonseed oil are limited to 7 months. The only way petitioner could maintain its "long" position over a period of time greater than 7 months was to dispose of its contracts prior to the delivery date and acquire other contracts calling for the future delivery of a like amount of refined oil in a later month. This was accomplished by means of "switching" through the brokers. A "switching" requires that the brokers either find somebody who is willing to take, for example, 10 tanks of May delivery in exchange for 10 tanks of September delivery or that the 10 tanks, the date for delivery of which is approaching, be sold on the market and 10 tanks for delivery at a later *17 date be purchased. Such transactions are always treated by the brokers as a purchase and sale, are so shown on the broker's statement to the customer and a commission is charged by the broker. A tank of crude cottonseed oil consists of approximately 60,000 pounds. As sales were made during the 1938-1939 season by petitioner of its crude cottonseed oil an equivalent amount of refined cottonseed oil was bought on the Commodities Exchange for future delivery. This was done in connection with all except the last 9 tanks of crude cottonseed oil produced and sold by petitioner. The sales and purchases were as follows: Date
Date Futures
Maturity
Crude Oil
Refined Oil
of Futures
Shipped
Tanks
Bought
Tanks
Contracts
10/ 3/38
10
10/ 3/38
10
May
10/19/38
5
10/19/38
5
May
10/28/38
5
10/28/38
5
May
10/31/38
5
10/31/38
5
May
11/ 2/38
5
11/ 2/38
5
May
12/29/38
7
12/29/38
7
July
1/23/39
5
1/23/39
5
July
2/ 6/39
5
2/ 6/39
5
Sept.
2/23/39
5
2/23/39
5
Sept.
2/27/39
6
2/27/39
6
Sept.
Total
58 Tanks
58 Tanks
As the maturity dates of the futures contracts approached petitioner requested its broker to "switch" such contracts to contracts *18 maturing at a later date. The details of these transactions are not shown in the present record. Petitioner was required to maintain a margin of $300 per tank on its purchases of refined oil and, as the price declined, it was required to make additional deposits. The gain or loss on each sale was reflected in petitioner's account on the books of the broker; but neither the books nor copies thereof are in evidence. In dealing in futures on the Commodity Exchange when a futures contract is sold by the broker the proceeds are credited to the account of the customer and any credit then shown in the account may be withdrawn by the customer. If contracts for delivery at a later date are purchased, they may be paid for at that time or they may be carried on margin. Final settlement is made when the contracts are sold or fulfilled. In September of 1939 (during the fiscal year ending August 31, 1940) petitioner sold the 58 tanks of refined oil which it had purchased for future delivery and thereafter made no further purchases of futures. The losses sustained by petitioner in connection with the "switching" of its position during the fiscal period beginning September 1, 1938 and ending August *19 31, 1939 amounted to $62,400. On its income tax return for that period petitioner deducted $62,400, reporting on its income tax return for that period a net loss of $48,062.85. In determining the deficiency in tax for that period the respondent determined that the losses resulted from the sale of capital assets and were allowable only to the extent of $2,000 under Section 117 (d) of the Revenue Act of 1938. The contracts acquired by the petitioner through the "switching" operations in the earlier fiscal year, owned by it at the beginning of the latter fiscal year, and sold by it during that period, resulted in a profit to petitioner of $47,514. In its return for the fiscal year ending August 31, 1940 petitioner reported net income of $7,535.66. In preparing its return for this period petitioner offset against the profit realized from its dealings in futures during that period - $47,514 - the loss which had been sustained in the earlier period - $62,400 - and deducted from gross income the difference between these amounts, i.e., $14,886 as a loss. The deduction was disallowed by the respondent, the $47,514 was included in gross income and other adjustments were made which are not *20 now in issue. Opinion As indicated at the outset petitioner contends that its purchases and sales of refined cottonseed oil were "hedges". The essence of its argument upon brief may be gleaned from the following excerpt: * * * On account of the unsatisfactory market conditions of seed and crude oil prices, petitioner sold its crude oil, when the seed that produced it was bought, and the crude oil was actually delivered, as sold. Having seed on hand to be processed and being committed to accept future seed at an undetermined price, every time petitioner sold its crude oil, it did not place orders for future purchases of refined oil, but it actually bought, at the same time of its sale, a specified number of tanks of futures refined oil at a then and there designated price, to protect and insure itself against an equal number of tanks of crude oil to be later manufactured; and at no time did petitioner sell crude oil and then, at a later date, purchase futures contracts of refined oil. When it sold 10 tanks of crude oil at a definite fixed price knowing that it would manufacture, from seed on hand and seed for which it was committed, another 10 tanks of crude oil, which it had to *21 sell, petitioner, then and there, bought at a fixed definite price 10 tanks of futures refined oil. Paradoxically both parties rely upon Commissioner v. Farmers & Ginners Cotton Oil Co., (C.C.A. 5), 120 Fed. (2d) 772, certiorari denied 314 U.S. 683. This case originated before the Board of Tax Appeals, which, after promulgating a decision sustaining the Commissioner's view that futures contracts were capital assets and the losses resulting therefrom were dedeductible only to the extent allowed by the capital gain and loss provisions of the statute ( Farmers & Ginners Cotton Oil Co., 41 B.T.A. 255), reversed the holding of the Division (idem 41 B.T.A. 1083), several members dissenting, and held that the dealing in futures was a "hedge." The Circuit Court of Appeals reversed. Petitioner attempts to support its theory - which seems to be that the "hedge" was against cotton seed rather than against crude cottonseed oil - by quoting several excerpts from the opinion of the court. Thus it says the facts are entirely different because it had not followed what the court *22 referred to as "the customary practice" of the taxpayer in the cited case, "to sell the crude oil at the prevailing market price and then to place orders [sometimes weeks later] with brokers to purchase futures * * *." Also "it [Farmers & Ginners Co.]sold crude and bought refined when it had no actual commodity on hand or future commitments to be protected from price variations. * * * It had no crude or refined oil on hand when it bought or sold the futures from which the losses in controversy were incurred." These quotations, petitioner insists, "seem to say that if the Farmers & Ginners Cotton Oil Company had actual commodity on hand and had actual commitments to be protected against, that it would amount to a true 'hedge'." We do not agree. A hedge, as the court pointed out, "is a form of price insurance; it is resorted to by business men to avoid the risk of changes in the market price of a commodity. The basic principle of hedging is the maintenance of an even or balanced market position." It is "a means by which collectors and exporters of grain or other products, and manufacturers who make contracts in advance for the sale of their goods, secure themselves against the fluctuations *23 of the market by counter contracts for the purchase or sale, as the case may be, of an equal quantity of the product, or of the material of manufacture." Board of Trade v. Christie Grain & Stock Co., 198 U.S. 236, 249. "To exercise a choice of risks, to sell one commodity and buy another, is not a hedge; it is merely continuing the risk in a different form." Commissioner v. Farmers & Ginners Cotton Oil Co., supra.While we are of the opinion that is what petitioner did, we will analyze its contention more fully in the light of the evidence adduced. Petitioner upon brief refers to its "committments" for cotton seed. While it is clear it had to have cotton seed if it expected to carry on its crushing business, it is far from clear that it ever had any real "commitments" for the purchase of seed other than its contracts with ginners for the purchase, at market, of 100 ton lots. "The basic price would be fixed on that 100 tons. When he delivered that possibility he would sell some more." Nor can any real "commitments" be spelled out of the loans made by petitioner to the ginners. Petitioner merely agreed to loan them money *24 if they would bring their seed to it; but it "had no agreement as to what price it would pay" when the money was loaned. "No agreement as to price; it would be at the market at the time they delivered the seed." Nor is there any evidence from which it could be determined that petitioner always had on hand, at the time each future was purchased, sufficient seed to manufacture an equal quantity of crude oil. However that may be it is clear petitioner decided to purchase futures, not because of the price of cotton seed or its commitments to purchase cotton seed but because of the "unsatisfactory crude oil prices." When its responsible officer, testifying as a witness, was asked whether the purpose of the company in purchasing the futures was to protect it against what it had sold or had to sell (crude oil) or to protect the seed it had contracted to buy, he said "Both." As we view it, the distinction, if any, between the present facts and those before the court in the Farmers & Ginners case is so small as to be practically negligible. In our judgment petitioner has failed to prove that its dealing in futures was a true "hedge". On the authority of Farmers & Ginners Cotton Oil *25 Co., supra, decision must be entered limiting its loss in the fiscal period ending August 31, 1939, to $2,000 unless a different result is justified under some theory not yet considered. Petitioner contends that taxable gain or deductible loss from its transactions resulted only when, upon closing out a contract for the future delivery of refined cottonseed oil, it did not simultaneously acquire another similar contract. It also contends that the losses from its "switching" are not recognizable because of the "Wash Sales" provisions of the statute. [1]
*26 Transactions in commodity futures are commonly referred to either as a purchase and sale of specific commodities, or a purchase and sale of contracts under which the trader acquires a right to the specific commodity. In either view there is a purchase and sale of property. George W. Covington, et al., 42 B.T.A. 601, affirmed on this point Commissioner v. Covington, 120 Fed. (2d) 768, certiorari denied 315 U.S. 822. The petitioner, having purchased futures, could demand delivery of the commodity or sell its right to the commodity to another. It therefore makes no difference whether the transaction was closed by an exchange of warehouse receipts or without that formality. In legal effect there was a delivery of the commodity sold. Board of Trade v. Christie Grain & Stock Co., supra;Lyons Milling Co. v. Goffe & Carkener, Inc., 46 Fed. (2d) 241. It must be assumed that the gain or loss incident to the sale and all charges, including the broker's commissions, were reflected in petitioner's account on the books of the broker and on the statement *27 which it sent to the petitioner. While the statements are not in evidence the broker testified, and we take judicial notice of the fact, that at any time a sale was made petitioner could have drawn down any resulting profit. Its losses, if any, likewise then became payable after the margin was exhausted. It is therefore plain that the transaction was closed for income tax purposes and the losses occasioned thereby were incurred in the sale or exchange of a capital asset within the meaning of section 117 of the Revenue Act of 1938. Nor was the character of the transaction changed by the fact that the petitioner, at the time of the sale of refined oil futures, concurrently purchased an equal amount of the same commodity for future delivery. Robert M. Harriss, 44 B.T.A. 999 (on appeal 2 C.C.A. * ); a1 Valley Waste Mills v. Page, 115 Fed. (2d) 466, certiorari denied 312 U.S. 681. Petitioner's contention that its transactions in refined oil futures come within the "Wash Sales" provision of the statute *28 must also be denied. The statute relates only to stock or securities. Here, as has been pointed out, petitioner sold and purchased refined cottonseed oil or a right to such oil, which for present purposes amounts to the same thing. When a sale was made the transaction was closed and taxable gain or deductible loss resulted. Valley Waste Mills v. Page, supra. The Commissioner committed no error in determining the deficiencies in tax. Decision will be entered for the respondent. Footnotes
1. SEC. 118. LOSS FROM WASH SALES OF STOCK OR SECURITIES. (a) In the case of any loss claimed to have been sustained from any sale or other disposition of shares of stock or securities where it appears that, within a period beginning 30 days before the date of such sale or disposition and ending 30 days after such date, the taxpayer has acquired (by purchase or by an exchange upon which the entire amount of gain or loss was recognized by law), or has entered into a contract or option so to acquire, substantially identical stock or securities, then no deduction for the loss shall be allowed under section 23 (e) (2); nor shall such deduction be allowed under section 23 (f) unless the claim is made by a corporation, a dealer in stocks or securities, and with respect to a transaction made in the ordinary course of its business.↩
*. BTA decision subsequently affirmed by CCA-2, 143 Fed. (2d) 279↩.