*Decision will be entered under Rule 50.*

WOOL DISTRIBUTING CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 60841. Filed May 27, 1960.

*Ira M. Millstein, Esq.,* and *Benjamin Clark, Esq.,* for the petitioner. *Clarence P. Brazill, Jr., Esq.,* for the respondent.

328

330

OPINION.

Kern, *Judge:* The question to be decided in this proceeding is whether the net losses that petitioner sustained during the taxable year as the result of its dealings in pound sterling and French franc futures are ordinary losses deductible in full from gross income or, as respondent has determined, capital losses allowable only to the extent of offsetting capital gains of which petitioner had none because such futures were capital assets within the meaning of section 117 of the Internal Revenue Code of 1939.[2] The question is essentially one of fact.

It is apparent from the contentions of the parties that the basic issue between them is whether or not petitioner's dealings in currency futures constituted transactions which may be properly characterized in this case as hedging operations carried on in connection with and as a part of its regular business. The term "hedging" does not lend itself to precise or ready definition. *Kenneth S. Battelle,* 47 B.T.A. 117. It is more a descriptive label that the Commissioner and the courts have applied to certain futures transactions which, on

---

[2] SEC. 117. CAPITAL GAINS AND LOSSES.

(a) DEFINITIONS.—As used in this chapter—

(1) CAPITAL ASSETS.—The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

(B) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1), or real property used in his trade or business;

\* \* \* \* \* \* \*

(d) LIMITATION ON CAPITAL LOSSES.—

(1) CORPORATIONS.—In the case of a corporation, losses from sales or exchanges of capital assets snall be allowed only to the extent of gains from such sales or exchanges.

all the facts and circumstances, have been found to be a form of price insurance and thus connected so closely with the regular conduct of a trade or business as to defy classification as extraneous investments. See *Corn Products Refining Co.* v. *Commissioner*, 350 U.S. 46; G.C.M. 17322, XV-2 C.B. 151; *Commissioner* v. *Farmers & Ginners Cotton Oil Co.*, 120 F. 2d 772, reversing 41 B.T.A. 1083, certiorari denied 314 U.S. 683.

A dealer with stocks of a particular commodity on hand runs the risk of loss should the market price of the commodity fall. To minimize that risk he will customarily enter a futures market and sell the same or a related commodity short in an amount equivalent to the amount in inventory. In this way he reaches an even or balanced position between actuals and futures, so that any loss resulting from a decline in the market price of the actuals will be offset *pro tanto* by the gains derived from closing out the futures at a commensurately lower cost. G.C.M. 17322, *supra.* However, such a balancing of gain and loss will not be possible unless the market prices of the actuals and the futures are so related that they normally rise or fall together. If they do not, then the futures will increase rather than diminish the overall risk. For this reason hedging presupposes an intimate price relationship between the two. The actuals and futures need not be in the same commodity so long as their prices move in relation to each other. *Albert Kurtin,* 26 T.C. 958. Nor must the futures be in the exact amount of the actuals; the latter may be covered entirely or only to the extent protection is desired. *Stewart Silk Corporation,* 9 T.C. 174. But a larger amount of futures than of actuals or an absence of price relationship between the two will suggest that the futures were acquired as an investment and not as a hedge.

Reasoning from the principles of these cases, we think that under the peculiar facts of this case the petitioner has successfully met the burden of qualifying the instant currency futures as being essentially hedging transactions. During the period October 1951 to October 1952 the petitioner carried an extraordinarily large wool inventory which for the most part was of sterling area and French origin. Throughout the same period rumors that the pound sterling and French franc would be devalued were widespread. Petitioner reasonably anticipated such an event as a possibility. Had it occurred, the devaluation of these currencies would have effected an immediate reduction in the price of sterling area and French wools in terms of dollars. Since the price those wools bring in the domestic market characteristically follows their replacement cost in the markets of origin, the petitioner could reasonably anticipate that devalua-

tion would bring about a substantial decline in the value of its inventory—a decline it was in no position to sustain because that inventory had by and large been paid for with borrowed funds. An additional factor was the 120-day sterling guarantee to Pacific Mills which made devaluation a particular threat with respect to wools accumulated for delivery under the contract.

Accordingly, and in specific response to what it believed to be an imminent possibility of devaluation, the petitioner sold pounds sterling and French francs short in amounts which it estimated to approximate its holding of sterling area and French wools. At no time did its holdings of currency futures exceed its inventory of those wools.

Under normal business circumstances the price of pound sterling or French franc futures and the price of sterling area or French wools have little connection with each other. But devaluation is not a normal business circumstance, and it was the prospect of devaluation in 1951 and 1952 that established a bridge between the two insofar as American dealers in foreign wools were concerned. In the light of this unusual economic situation we are satisfied that the dealings in currency futures involved herein were transactions entered into by petitioner with the bona fide intent of providing a particular temporary form of price insurance protecting its large inventory from the particular temporary threat posed by the reasonably anticipated possibility of currency devaluation, and thus were sufficiently in the nature of hedging operations as to remove the currency futures dealt in from the category of capital assets.

Respondent points out, however, that petitioner realized a profit of $224,626.42 from its transactions in the domestic wool futures market, and draws the conclusion that more extensive recourse to that market would have provided all the price insurance that petitioner required. According to the expert and uncontradicted testimony herein this was not so. Concededly, domestic wool futures are sensitive to broad movements in domestic wool prices which in turn tend to follow the prices of foreign wools of equivalent grade. But wool prices either here or abroad are influenced by a number of independent economic and physical factors, of which devaluation would be only one. For this reason it cannot be said with any degree of certainty that domestic wool futures quotations would have adjusted immediately, or even ultimately, to the kind of sharp, but not necessarily sustained, decline in foreign wool prices that devaluation would induce. But even if we assume *arguendo* that domestic wool futures would have afforded equally effective insurance against the peculiar peril of devaluation, it does not ·follow that petitioner's

foreign currency futures were not substantially in the nature of bona fide hedging transactions for the petitioner was entitled to examine different methods of shielding itself from the potentially ruinous effects of devaluation and choose the one that seemed best suited to its needs. In our opinion, the integral relationship of these futures to petitioner's regular business operations is clear. See *Corn Products Refining Co.* v. *Commissioner, supra; America-Southeast Asia Co.*, 26 T.C. 198.

Upon the issue presented to us herein, we decide in favor of petitioner.

*Decision will be entered under Rule 50.*