NICHOLAS C. AND MOLLY G. PATTERSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Patterson v. Commissioner
Docket No. 4169-78.
United States Tax Court
T.C. Memo 1981-43; 1981 Tax Ct. Memo LEXIS 703; 41 T.C.M. (CCH) 807; T.C.M. (RIA) 81043; February 2, 1981. William Lee Fergus, for the petitioners. Osmun R. Latrobe, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined a deficiency in petitioners' Federal income tax for 1975 in the amount of $ 5,138.75. The only issue presented for decision is whether losses incurred on the sale of certain commodity futures contracts are ordinary or capital losses. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulations of fact and attached exhibits are incorporated herein by reference. Nicholas C. Patterson (hereinafter referred *704 to as petitioner) and Molly G. Patterson are married and resided in Blytheville, Arkansas, when they filed their petition in this case. Petitioner's principal source of income is from farming operations in and around Blytheville. During 1975 his farm income was derived primarily from four crops, as follows: Crop
Gross Receipts
Cotton
$ 40,442
Grain
28,992
Soybeans
150,138
Alfalfa
3,033
Petitioner also traded actively in commodity futures contracts of wheat, cotton, corn, and soybeans through an account he maintained with the brokerage firm of Merrill, Lynch, Pierce, Fenneer & Smith, Inc. During 1975 he engaged in 139 separate transactions involving the purchase or sale of commodity futures. Of these transactions, 39 dealt with soybean futures. In petitioner's farming locality soybeans are planted in May or June of each year. The crop is harvested in September, October, or November, depending upon the particular variety of soybean planted. Because petitioner has no storage facilities, he must either sell his grain when harvested or else pay to have it stored in commercial grain elevators. During the 1975 harvest season the soybean market was depressed *705 and many farmers elected to store their beans in commercial grain elevators rather than sell them outright. As a result, at various times during the harvest season petitioner found the grain elevators with which he normally dealt fully booked and unable to store his beans for more than a ten-day period. Thus, he was forced to sell, rather than store, the following portions of his soybean crop: Quantity
Amount
Date of Sale
Grain Elevator
(Bushels)
Received
October 27, 1975
Bunge Corp.
5327.33
$ 19,496.61
October 27, 1975
Bunge Corp.
1526.16
7,906.56
October 27, 1975
Farmer's Soybean
1475.88
6,439.04
8329.37
$ 33,842.21
November 10, 1975
Bunge Corp.
220.17
$ 975.57
November 10, 1975
Bunge Corp.
151.81
678.13
November 10, 1975
Bunge Corp.
2475.43
8,990.66
November 10, 1975
Farmer's Soybean
532.41
2,009.85
* 3379.82
$ 12,654.21
November 20, 1975
Bunge Corp.
2856.97
$ 10,722.33
November 20, 1975
Bunge Corp.
738.55
2,786.99
November 20, 1975
Bunge Corp.
2094.73
7,405.83
5690.25
$ 20,915.15
Concurrently with *706 the sales of his crop on October 27, November 10, and November 20, 1975, petitioner purchased the following soybean futures contracts. Date of
Purchase
Contract Delivery Date
Quantity * (Bushels)
October 27, 1975
May 1976
5,000
October 27, 1975
May 1976
5,000
October 27, 1975
May 1976
5,000
November 10, 1975
May 1976
5,000
November 20, 1975
May 1976
5,000
Petitioner closed out these positions by selling identical contracts on December 31, 1975, at a total loss of $ 10,277.50. None of the commodity futures transactions entered into by petitioner during 1975 were intended to fix the future delivery price of a commodity being produced or being held in storage by the petitioners so as to eliminate the speculative risk of fluctuations in the spot market price prior to disposition of the actual commodity. On their 1975 Federal income tax return petitioners reported ordinary losses from the sales of futures contracts during the year totaling $ 22,412. Respondent determined that all of the losses were capital in nature and initially asserted *707 a deficiency of $ 11,230.40. Petitioners subsequently conceded that $ 12,134.50 of the net loss is properly characterized as a capital loss. Still in dispute is the nature of the $ 10,277.50 loss attributable to the sale of the five soybean futures contracts on December 31, 1975, and to which the $ 5,138.75 adjustment in the statutory notice pertains. In the event this amount is determined to be a capital loss, no deduction shall be allowed for 1975 since petitioners have already claimed the maximum capital loss deduction allowable for that year. OPINION We must decide whether the soybean futures contracts sold by petitioner on December 31, 1975, were capital assets under section 1221. [1] Since commodity futures contracts do not fall within any of the statutory exceptions to the definition of capital assets then in effect (see paragraphs (1) through (5) of section 1221), they are normally considered to be capital assets. United States v. Rogers,286 F.2d 277 (6th Cir. 1961), cert. denied 366 U.S. 951 (1961); Muldrow v. Commissioner,38 T.C. 907 (1962).However, a long-standing exception to this general rule has existed with regard *708 to bona fide hedging transactions in commodity futures. In Muldrow v. Commissioner,supra at 913, this Court defined nedging transactions as follows: A hedge * * * i not a transaction looking to a favorable fluctuation in price for the realization of profit on the particular futures contract itself, as in the case of a speculative or capital transaction, but is a form of insurance against unfavorable fluctuations in the price of a commodity in which a position has already become fixed * * * in normal course and the sale, liquidation, or use of the commodity is to occur at some time in the future. * * * In order for a futures transaction to qualify as a bona fide hedge there must be: (1) a risk of loss by unfavorable changes in the price of something expected to be used or marketed in one's business; (2) a possibility of shifting such risk to someone else, through the purchase or sale of futures contracts; and (3) an intention and attempt to so shift the risk. Sicanoff Vegetable Oil Corp. v. Commissioner,27 T.C. 1056, 1067-1068 (1957), *709 revd. on other issues 251 F.2d 764 (7th Cir. 1958). The essence of a hedge is a balanced market position. For example, suppose a farmer plants a soybean crop in May and expects to harvest it in November. He is worried that the price of soybeans may decline as the harvest season, approaches and to protect against this possibility, he sells soybean futures contracts specifying November delivery (i.e., he assumes a short position in the futures market). Should the price of soybeans drop, as he anticipates, the value of his crop will likewise diminish, but this loss will be offset by the gain he will recognize when he closes out his short position (either by actual delivery of the commodity or by the purchase of an offsetting contract promising delivery in the same month as the short contract). Here the motive is not to profit by speculation in the futures market, but rather to minimize the risk of adverse fluctuations in the price of a commodity in which the farmer has already assumed a fixed position. Hence, when the farmer closes out his short position he recognizes an ordinary gain or loss. See generally Commissioner v. Farmers & Ginners Cotton Oil Co.,120 F.2d 772 (5th Cir. 1941), *710 cert. denied 314 U.S. 683 (1941); Trenton Cotton Oil Co. v. Commissioner,147 F.2d 33 (6th Cir. 1945); Wool Distributing Corp. v. Commissioner,34 T.C. 323 (1960); Stewart Silk Corp. v. Commissioner,9 T.C. 174 (1947); see also section 1233(g), which exempts hedging transactions in commodity futures from the provisions of section 1233 whereby short sales of commodity futures are treated as sales of capital assets. In the present case it is clear that the disputed futures contracts in no way qualify as hedging transactions. Contracts in the long position cannot serve as a hedge against unfavorable movements in the price of a farmer's crop because the farmer has not attained a balanced position. [2] In the event the market price of the commodity falls, the farmer stands to lose on both his crop inventory and his futures contracts. Thus, the essential protective function performed by a hedge is missing. Moreover, in the present case the purchase of the futures contracts coincided with the sale of petitioner's inventory, thereby making it impossible for the contracts to serve as a hedge against declines in the value of *711 such inventory. Petitioner has clearly conceded as much by stipulating that none of his futures transactions were designed to fix the future delivery price of his crop so as to eliminate the risk of fluctuations in the spot market price prior to disposition of the actual commodity. Nevertheless, petitioner argues that ordinary loss treatment is warranted because the five transactions were an integral part of his business operations under the doctrine of Corn Products Refining Co. v. Commissioner,350 U.S. 46 (1955). In that case the taxpayer manufactured various distilled products from corn. It had limited storage facilities and was unable to purchase enough raw corn on the spot market when prices were low to insure an adequate source of supply. Consequently, it purchased corn futures during the harvest season when prices were lower, *712 took delivery on the contracts as necessary for its operations and sold the remainder. The Supreme Court did not consider this to be a true hedge, but nevertheless ruled that the gain realized on the sale of the futures was ordinary income since the transactions were an integral part of the taxpayer's business operations: We find nothing in this record to support the contention that Corn Products' futures activity was separate and apart from its manufacturing operation. On the contrary, it appears that the transactions were vitally important to the company's business as a form of insurance against increases in the price of raw corn. Not only were the purchases initiated for just this reason, but the petitioner's sales policy, selling in the future at a fixed price or less, continued to leave it exceedingly vulnerable to rises in the price of corn. Further, the purchase of corn futures assured the company a source of supply which was admittedly cheaper than constructing additional storage facilities for raw corn. Under these facts it is difficult to imagine a program more closely geared to a company's manufacturing enterprise or more important to its successful operation. [350 U.S. at 50.]
*713 Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss.* * * [350 U.S. at 52.] Petitioner contends that the Corn Products rationale is equally applicable here. He maintains that on the dates the contracts were purchased he had no storage facilities and the commercial grain elevators he normally dealt with were fully booked and unable to store his grain. As a result, he testified, he was forced to sell substantial portions of his harvested soybean crop at depressed prices, even though he would have preferred to sell at a later date in order to take advantage of what he anticipated to be a rising soybean market. The soybean futures, he argues, provided him with an alternative means for benefiting from the hoped-for market increases by serving as a form of substitute or replacement for the actual crop. Thus, he contends that the contracts were an integral part of his business under Corn Products and that ordinary loss treatment is warranted upon their disposition. Respondent, on the other hand, argues that the contracts were purchased and held for *714 investment purposes and were not sufficiently related to petitioner's farming operations to justify the application of the Corn Products doctrine. Even assuming a direct causal connection between petitioner's contract purchases and the sale of portions of his crop, [3] we have little difficulty concluding that the rationale of Corn Products and its progeny has no application in this case. The essence of the Corn Products doctrine, as we stated in Hoover Co. v. Commissioner,72 T.C. 206, 237 (1979), is that "seemingly capital property transactions are entitled to ordinary treatment only when the transactions are an integral part of the taxpayer's day-to-day business operations or are necessary to protect or generate ordinary operating income." The mere fact that petitioner's futures acquisitions happened to coincide with the sale of portions of his soybean crop does not justify the conclusion that the transactions were integrally related to his farming operations. To the contrary, we think the transactions were speculative in nature and wholly unrelated to any essential phase of the business. They served no protective function, as did the futures purchases *715 in CornProducts, by assuring a cheap source of supply of a raw material used in the farm business; they did not, as we have previously indicated, protect petitioner from potential losses on his unsold crop which might be attributable to subsequent adverse fluctuations in the soybean market; nor were the futures in any sense necessary to any aspect of his day-to-day farming business. See and compare HooverCo. v. Commissioner,supra; W.W. Windle Co. v. Commissioner,65 T.C. 694 (1976), appeal dismissed 550 F.2d 43 (1st Cir. 1977), cert. denied 431 U.S. 966 (1977); Schlumberger TechnologyCorp. v. United States,443 F.2d 1115 (5th Cir. 1971); Chemplast, Inc. v. Commissioner,60 T.C. 623 (1973), affd. in an unpublished opinion 506 F.2d 1050 (3d Cir. 1974); Booth Newspapers, Inc. v. United States,157 Ct. Cl. 886, 303 F.2d 916 (1962); Mansfield Journal Co. v. Commissioner,274 F.2d 284 (6th Cir. 1960), affg. 31 T.C. 902 (1959). Although the forced sale of his crop inventory at low prices may well have instilled a desire in petitioner *716 to recoup lost profits by speculating in the commodities market, that fact alone does not render the transactions any less speculative than the numerous other capital transactions in which he engaged during the year. Accordingly, the losses sustained by the petitioners are capital in nature and no deduction is allowable for 1975 because petitioners have already taken the maximum allowable capital loss deduction. Decision will be entered for the respondent. Footnotes
*. The figure stipulated to by the parties was actually 3379.32.↩
*. The standard soybean contract on the Chicago Board of Trade commodity exchange is for 5,000 bushels.↩
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the year in issue, unless otherwise indicated.↩
2. See Battelle v. Commissioner,47 B.T.A. 117 (1942); Hendrich v. Commissioner,T.C. Memo. 1980-322; Estate of Laughlin v. Commissioner,T.C. Memo. 1971-52; Carpenter v. Commissioner,T.C. Memo. 1966-188; Gee v. Commissioner,T.C. Memo. 1964-162↩.
3. The record indicates only a rough correspondence between the contract purchases and the crop sales, as follows: ↩
Total Futures
Total Crop
Date
Purchased (Bushels)
Inventory Sold (Bushels)
October 27, 1975
15,000
8329.37
November 10, 1975
5,000
3379.82
November 20, 1975
5,000
5690.25