**TRENTON COTTON OIL CO. v. COMMISSIONER OF INTERNAL REVENUE.**

No. 9799.

Circuit Court of Appeals, Sixth Circuit.

Feb. 8, 1945.

Rehearing Denied March 19, 1945.

See 148 F.2d 208.

Robert P. Adams, of Trenton, Tenn. (Taylor, Adams & Freeman, of Trenton, Tenn., on the brief), for petitioner.

Helen Goodner, of Washington, D. C. (Samuel O. Clark, Jr., J. Louis Monarch, and Helen R. Carloss, all of Washington, D. C., on the brief), for respondent.

Before HICKS, HAMILTON, and McALLISTER, Circuit Judges.

HAMILTON, Circuit Judge.

Petitioner, a Tennessee corporation, is engaged in the business of operating a cottonseed oil mill for the production of crude cottonseed oil and by-products. Its business is seasonal manufacturing operations extending from approximately mid-September to mid-March.

Petitioner acquires the cottonseed from ginners in approximately 100-ton lots graded and carrying a base price subject to adjustment when analyzed upon delivery. It frequently makes loans to ginners in advance of the ginning season conditioned that such borrowers will offer their seed when produced to petitioner at the then market price, petitioner being under no obligation to purchase the seed. On making a firm contract for the purchase of seed, petitioner estimates the amount of crude oil obtainable and immediately sells the oil to refiners for future delivery at a fixed price. Crude cottonseed oil deteriorates rapidly and if its value is to be preserved it must be refined shortly after production.

Petitioner's plant was not equipped for refining crude oil and its storage facilities were limited to about four and one-half tanks which furnished storage for two weeks' production only. Petitioner kept its accounts and made its income and excess profits tax returns on a fiscal year basis ending August 31st.

Petitioner was uncertain as to the amount of crude oil it could produce from the cottonseed it had contracted to buy and the price it might obtain therefor as the market was unstable. It produced sixty-seven tanks, of approximately 60,000 pounds each, during the operating season of 1938 and 1939. At the beginning of the season, petitioner's board of directors agreed that it would purchase on the Commodity Exchange tanks of refined oil equal to the number of tanks of crude oil sold on the date of the sale of the latter. During the 1938 and 1939 season, simultaneously with the sale of each tank of crude oil, petitioner purchased on margin for future delivery a tank of refined oil, except that no offsetting purchases were made for the last nine tanks of crude oil sold.

Under the rules of the exchange, refined oil purchased on margin must be delivered within seven months from date of purchase. Petitioner did not receive any of the refined oil, but through its broker exchanged its contracts for others maturing at a later date, thus maintaining its futures for fifty-eight tanks until September, 1939, when it sold all of them and thereafter made no futures purchases.

On its income tax return for the fiscal year ending August 31, 1939, petitioner

showed a net loss of $48,062.85. In determining this loss, it claimed as a deduction $62,400 the difference between the original purchase price of the refined oil futures and the sum it agreed to pay for replacements at the end of seven months from the date of each original purchase.

In its tax return for the fiscal year ending August 31, 1940, petitioner reported net income of $7,525.66. In determining net income, petitioner showed a profit from the sale of oil futures in the sum of $47,514 which it deducted from the $62,400 loss in the year 1939, leaving a net loss from the sale of futures of $14,886, which sum it deducted from gross income.

Respondent on audit and review determined that the loss sustained by petitioner for the fiscal year ending August 31, 1939, resulted from the sale of capital assets and was allowable only to the extent of $2,000 under Section 117(d) of the Revenue Act of 1938, 26 U.S.C.A. Int.Rev.Acts, page 389, and disallowed the entire loss claimed by petitioner for the year ending August 31, 1940, and included in gross income the entire profit realized by petitioner during the year from the sale of futures. The Tax Court sustained respondent.

The first question for decision is whether the losses sustained by petitioner from the dealings in refined cottonseed oil futures were ordinary and necessary business expenses under Section 23(a) (1) of the Internal Revenue Code, Title 26 U.S.C.A. Int.Rev.Code, § 23(a) (1), or capital losses under Section 117(d) (1) of the Code, Title 26 U.S.C.A. Int.Rev.Code, § 117(d) (1).

■ Losses from counter contracts made by manufacturers to protect themselves against fluctuations of markets in the purchase of raw material in advance of use, or sales of manufactured goods in advance of production, are treated under the Internal Revenue Statutes as ordinary business expenses, and gains from such sources are treated as ordinary income. Ben Grote v. Com'r, 41 B.T.A. 247; G.C.M. 173.22, XV-2, Cum.Bull. 151 (1936). Purchases and sales against price fluctuations are insurance against loss and such transactions have a direct relationship to profit realized or loss sustained in the conduct of a business.

■ Before such a loss may become allowable as a business expense, it must be made to appear that a contract has been entered into for the sale and delivery of a product at a future date and that there is a counter contract for the purchase of the same product for future delivery or one so akin to it that it affects the price of the former. The whole theory is that when the price goes up or down the gain on one transaction will offset the loss on the other. The price relationship, as shown by the evidence, between crude and refined oil is so intimate that the purchase of the latter for future delivery may be used as an insurance against risk of loss on the former sold for future delivery and the same is true as to the price relationship between refined oil and cottonseed.

The real question here is whether petitioner's contracts for the purchase of refined oil futures were made to protect it against loss on the purchases of cottonseed or on the sale of crude oil for future delivery.

The Tax Court found as a fact that petitioner's purchases were not for that purpose. This finding is supported by substantial evidence.

Petitioner's general manager testified that there was a thorough understanding and agreement among its officers and directors that refined oil futures would be purchased and held until such time as the market might reach the point where it would be possible for petitioner to protect or recover against what was considered a loss sustained by it through the sale of the season's production of crude cottonseed oil at unsatisfactory prices. The transactions had none of the characteristics of a protection against loss due to fluctuation in the market of a product which petitioner had sold for future delivery. It had used the cottonseed which it had purchased at a fixed price and had likewise sold the crude oil at a fixed price when it entered into the contracts to purchase refined oil futures. The transactions in futures have all the earmarks of purchasing and selling for future delivery with a view to profit based on the law of supply and demand or some other economic changes in the industry which would affect prices. United States v. New York Coffee & Sugar Exchange, 263 U.S. 611, 44 S.Ct. 225, 68 L. Ed. 475.

Section 112(a) (b) of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 112 (a) (b), provides in substance that the entire amount of gain or loss determined under Section 111 of the Code shall be recognized except that neither gain nor loss

shall be recognized if property held for productive use in trade or business or for investment is exchanged solely for property of like kind and held for the same purpose. There is excluded from the exception stock in trade or other property held primarily for sale, stocks, bonds, notes, choses in action, certificates of trust or beneficial interest or other securities or evidence of indebtedness or interest.

Petitioner contends that when it sold a refined oil futures contract and purchased another for the same quantity of oil for the purpose of maintaining its position in the futures market without the necessity of taking delivery of any oil, the sale was not a closed transaction, but that taxable gain or deductible loss on the sale resulted only when it sold a contract and did not simultaneously purchase another contract for future delivery of a like amount of refined oil.

■ The transactions of petitioner in oil futures are clearly within Section 112 (a) unless they come within the proviso of Section 112(b) and are not within its exclusions. It is well settled that the language of the Revenue Act is to be taken in its ordinary meaning unless the context or legislative history of the enactment impels a different interpretation. Old Colony Railroad Company v. Commissioner, 284 U.S. 552, 560, 52 S.Ct. 211, 76 L.Ed. 484. The Congress must be presumed to use words in their ordinarily known signification. Levy's Lessee v. McCartee, 6 Pet. 102, 31 U.S. 102, 110, 8 L.Ed. 334. The popular or usual import of words furnishes the general rule for the interpretation of public laws. Maillard v. Lawrence, 16 How. 251, 57 U.S. 251, 261, 14 L.Ed. 925.

■ The purpose of Section 112(b) was to save the taxpayer from an immediate recognition of gain and the tax thereon and conversely to intermit the claim of a loss in exchange transactions where gain or loss may have occurred in a constitutional sense, but where in a popular and economic sense there had been a mere change in the form of ownership or in other words that substance and not form should control in determining whether gain or loss had been realized or sustained. Portland Oil Company v. Com'r, 1 Cir., 109 F.2d 479.

■ The context of the Revenue Act and its legislative history give no hint that the word "exchange" as used in Section 112(b) is to be given other than its ordinary meaning. In this sense it means a mutual grant of equal interests, the one in consideration of the other. "Exchange" is a word of precise import, meaning the giving of one thing for another, requiring the transfers to be in kind, and excluding transactions into which money enters either as the consideration or as a basis of measure. United States v. Rodenbough, D.C.Pa., 21 F.2d 781. The term is almost synonymous with "barter." Postal Tel. Cable Co. v. Tonopah & T. R. R. Co., 248 U.S. 471, 474, 39 S.Ct. 162, 63 L.Ed. 365.

■ The sale of property and the immediate repurchase of like property is not an exchange, because the basis of the transaction is measured in money. This rule clearly appears where parties, through a common broker, sell property to one person and purchase similar property from another. The transaction has none of the characteristics of an exchange but consists of two sales. Petitioner's transactions in futures were sales and profit or loss resulted from each transaction depending upon whether petitioner received more or less than the original cost of the futures sold. The purchases of other futures simultaneously with each sale did not result in an exchange.

Section 118(a) of the Internal Revenue Code, 26 U.S.C.A. Int.Rev. Code, § 118(a), provides in substance that no loss shall be allowed from any sale or other disposition of shares of stock or securities where it appears that within a period beginning thirty days before the date of such sale or other disposition and ending thirty days after such date, the taxpayer has acquired or has entered into a contract or option so to acquire substantially identical stock or securities.

Petitioner insists that the repurchase by it of futures contracts simultaneously with the sale of such contracts is controlled by the above section of the Code, and that the new purchases by it within thirty days after the sale took the cost of the old futures sold, and that the losses claimed by it on its original return for the fiscal year ending August 31, 1939, should be disallowed in that year and allowed the following year.

The statute does not define the term "stock or securities", and it is therefore necessary to resort in interpreting the provision to the common and ordinary mean-

ing of these words. The earlier Revenue Acts permitted broadly the deduction of losses on the sale of securities. Under these acts, where a taxpayer made a bona fide sale of securities, although he purchased simultaneously the same securities at the same price, the loss was allowable. The Congress, realizing that loss of revenue was inherent in these transactions, in the 1921 Revenue Act erected the present barrier to their deduction.

The sole purpose of the statute was to prevent the deduction of losses from net income and the Congress set up as a barrier a more or less arbitrary standard to overcome the evil. Unless losses from dealings in commodity futures through a broker are within the statute, the barrier is weakened, because the dealings in such property on exchanges of the country is almost as extensive as that in stocks and bonds.

The whole question turns on the meaning of the word "securities." It may be helpful in arriving at a correct definition to give some thought to the character of the transactions with which we are dealing.

 The relationship between petitioner and the broker was that of pledgor and pledgee. Richardson v. Shaw, 209 U.S. 365, 376, 28 S.Ct. 512, 52 L.Ed. 835, 14 Ann.Cas. 981. An assignment of a contract for delivery of refined cottonseed oil on a future day as collateral operates in equity as a contract for a pledge, and the lien attaches to the oil as soon as it comes into existence and possession under the contract. The contracts petitioner made with its broker, although executory at the beginning, were made for the express purpose of being transferred directly or indirectly by further contracts. They constituted evidence of a right to property and they could be assigned and transferred and were security to the broker who had advanced the necessary funds to purchase the oil. The broker held the oil in trust to the extent of its claim and then for the petitioner.

Webster's International Dictionary defines "securities" as "that which secures or makes safe; Specifically, something given, deposited or pledged; to make secure or certain; or certain the fulfillment of an obligation; the payment of a debt; an evidence of debt or of property, as a bond, a stock certificate or other instrument, etc.; a document giving the holder the right to demand and receive property not in his possession." The Oxford English Dictionary says a "security" is a "document held by a creditor as guarantee of his right to payment; hence, any particular kind of stock, shares or other form of investment guaranteed by such documents." As applied to dealings in property and to commercial transactions, the word "security" under present usage has a generous scope far beyond its literal meaning.

It may be that when petitioner sold futures contracts and repurchased others of a like amount there was a constructive delivery of the cottonseed oil to petitioner and a constructive re-delivery to the broker, but considering the substance of the transactions rather than their form, petitioner had no more than a document giving it the right to demand and receive property not in its possession. This is a security.

 We think it is quite clear that petitioner was using the facilities of the Commodity Exchange in its business of buying and selling rights in commodities and that it is equally clear that the Tax Court was correct in holding that the losses petitioner sustained were capital losses subject to limitations of Section 117(d) On the other hand, we think it is just as clear that in those instances where petitioner sold a futures contract and bought a new futures contract for the same quantity of cottonseed oil sold, a wash sale of securities under Section 118 resulted.

In determining taxable income of petitioner for the years in question, the losses or gains sustained or realized by it in the sale and purchases of cottonseed oil futures should be determined under Sections 117 and 118 of the Internal Revenue Code integrated.

The order of the Tax Court is reversed and the cause is remanded for further proceedings consonant with this opinion.