**SCOTT et al. v. UNITED STATES.**
**No. 10387.**

Circuit Court of Appeals, Sixth Circuit.

June 3, 1947.

Lewis S. Pope, of Nashville, Tenn. (Lewis S. Pope, of Nashville, Tenn., and J. H. Reneau, Sr. and J. H. Reneau, Jr., both of Celina, Tenn., on the brief), for appellants.

Alvin O. West, of Washington, D. C. (David L. Bazelon, of Washington, D. C., Horace Frierson and S. E. Wasson, both of Nashville, Tenn., Keith Bohanon, of Cookeville, Tenn., Roger P. Marquis and Alvin O. West, both of Washington, D. C., on the brief), for appellee.

Before SIMONS, ALLEN and MARTIN, Circuit Judges.

MARTIN, Circuit Judge.

This is an appeal from a judgment entered on a directed verdict in a land condemnation case, in which the United States of America is plaintiff. The jury was instructed to return a verdict for $10,688, being the amount specified in an option contract executed by appellants F. A. Scott and Geneva Scott, on November 26, 1942. The owner of the land, F. A. Scott, who could neither read nor write, executed the option agreement by affixing his mark thereto. Geneva Scott, in her capacity as his wife, joined in the option by signing her name to it.

The agreement provided that, in the event the United States determined to acquire the land by eminent domain or judicial proceedings, the vendor would cooperate to the end of expediting such proceedings; and that the amount stated in the option would be the award to be decreed for the taking of the property.

On December 17, 1942, the United States filed eminent domain proceedings under specified Acts of Congress to condemn more than 6,000 acres of land in Clay County, Tennessee, as a part of an authorized flood-control project. Included in the land sought to be condemned was the farm of 203.3 acres, more or less, belonging to appellant, F. A. Scott. The condemnation petition prayed for a trial by jury, as provided by Chapter 252 of the Acts of Tennessee for

1937. It is *not* Chapter 252, but is Chapter 262 of the Acts of 1937, however, which provides for a jury trial in land condemnation cases. See Williams' Tennessee Code of 1934, section 3171.5. The petition made no mention of any option agreement pertaining to the land described.

In their original answer, appellants admitted the right of the government to condemn the land, provided they received just compensation for its taking. They denied that the amount deposited in the registry of the court constituted just compensation for the fair and reasonable value of the property. They waived a jury of view, and demanded a trial by jury.

In an amendment to their answer, appellants asserted that the tract of land owned by Scott is divided into two parts of approximately equal acreage "cut apart by a road practically in the middle," one-half being known as the Wolf River side and the other as the Obey River side. The amended answer stated that, a short time before the execution of the option, a man came to appellants' home and asked Mr. Scott what he would take for the land being condemned by the United States and received the reply that appellant did not know, but that shortly before he had been offered $10,500 for the half of the land on the Wolf River side and that he thought the other side was worth fully as much. The man then asked him "whether or not he would take that for it and settle it;" and appellant replied that he would. Soon thereafter, the same man, or some other person representing the government, brought the option agreement to him and told him that it covered only the Wolf River side.

The answer averred that the paper was not read to appellant; that Scott can neither read nor write; that he had confidence in the man, even though a stranger, because he represented the United States Government; and that Scott authorized his mark to be made to the paper with the clear and positive understanding that it covered only the Wolf River side of his farm.

It was further averred that the two tracts of the Scott farm are worth considerably more than $20,000; that Scott paid $15,000 for the land more than 20 years ago; that he has added buildings and improvements and repaired other buildings; that he has farmed the land in such manner as to improve it; and that the tracts are considerably more available than when he bought them.

It was pleaded in the answer, moreover, that the option contract was procured either by error, mistake, or misunderstanding on the part of appellant, or from fraud practiced by the representative of the United States Government.

■ When the case came on for trial, a continuance for the term was granted on motion of the United States. Before the trial appellants presented a second amendment to their answer, averring that when they learned for the first time in December, 1942, that the government was claiming that the option covered the whole of the farm, they gave first, oral notice and, later, on January 12, 1943, notice in writing that under the facts and circumstances surrounding the procurement of the option on the property they deemed it null and void and would not execute a deed to the United States for the consideration stated in the option. The district court erroneously declined, in our judgment, to permit this amendment.

The case came on for trial on June 13, 1946; and both sides introduced the testimony of several witnesses. The option agreement was offered by the government and received in evidence. We do not intend to review the evidence in the case, but will limit discussion of the facts merely to pointing out the substantial evidence upon which the plaintiffs, now appellants, were entitled to have their case submitted to the jury.

The testimony of both appellants, F. A. Scott and his wife, Geneva Scott, directly contradicted the testimony of J. B. Pierce, the only witness offered by the government as to the execution of the option agreement. Mrs. Scott testified that Pierce neither read nor offered to read that document to them; but that he explained that the option which they were signing was for half of the farm and that "there would be another man there the next week with

another option to sign for the other half of it." She swore, also, that this statement was made in the presence of her husband; and that Pierce said, further, that the buildings would be reserved from the option which they signed.

The testimony of the government witness, Pierce, was also contradicted by appellant, who said that the option was not read to him, that he "just took their word for it," and that no copy of the option was left with him. Scott testified further: "He [Pierce, the government representative] said he would let me have them [the buildings] at 10c on the dollar. Now, I says, 'I ain't going to sign up for all this land.' He says, 'You will have to sign this paper and get all the buildings.' Part of the buildings were on one side and part on the other. He says, 'Sign this paper and I will mark it up for half of the land,' is what he says." Scott testified, also, that Pierce said that he would get as much for the other half of the land as he was offered for the one for which he was giving the option. He stated that Pierce told him there would be another man around to take an option on the other part of the land; and that he didn't think he signed the option "for the whole thing," but for "just part of the land and all the buildings."

Appellant was a 72-year-old illiterate back woodsman. A sharp-cut issue of fact was presented as to whether he and his wife executed the option agreement by mistake caused by the fraudulent misrepresentations of the government agent. The value of the land covered by the option was shown by the testimony of four qualified witnesses —Plumlee, Donaldson, Paris and Bailey—to have ranged between $22,000 and $25,000. It would seem to be unreasonable, if the testimony of these witnesses is credible, that Scott would have been willing to sell the land for the consideration specified in the option, $10,688, when its value was more than twice that amount. The jury could readily have accepted the testimony of Scott and his wife that they had been imposed upon, or that they had at least been honestly mistaken as to the quantity of land to be taken, when they executed the option. There was certainly substantial evidence to support either conclusion.

More than 25 years ago, this court said, in Begert v. Payne, 6 Cir., 274, F. 784, 787, 788: "It is a commonplace that, upon a motion by a defendant for instructed verdict, it is the duty of the trial judge to give the plaintiff the benefit of every fair inference which might reasonably be drawn by the jury from the evidence, only guided by sound processes of reasoning and applicable principles of law. The credibility of witnesses is peculiarly for the jury. * * * *A verdict cannot properly be directed for defendant merely because the trial judge feels that, should the jury find in the plaintiff's favor, he would regard it his duty, in the exercise of a sound judicial discretion, to set the verdict aside. The test is whether there is such an utter absence of substantial evidence as to make it his duty, as matter of law, to set the verdict aside independently of the exercise of discretion, and without reference to how greatly the court may think the conflict in testimony to preponderate in favor of defendant.*" [Italics supplied.] . This court has steadily adhered to the doctrine. Line v. Erie R. Co., 6 Cir., 62 F.2d 657, 659; Grand Trunk Western R. Co. v. Collins, 6 Cir., 65 F.2d 875, 876; Grand Trunk Western R. Co. v. Heatlie, 6 Cir., 48 F.2d 759, 761; Minneapolis, St. P. & S. S. M. R. Co. v. Galvin, 6 Cir., 54 F.2d 202, 203. Cf. Gajda v. Reick-McJunkin Dairy Co., 6 Cir., 18 F.2d 279, 280; United S. S. Co. v. Barber, 6 Cir., 4 F.2d 625.

The trial judge manifested a misconception of his function when, during the argument on the motion for a directed verdict, he said: "In the Federal Court, the Court can direct a verdict on the preponderance of the evidence if the Court would not permit a verdict to stand on motion for new trial." He evidently applied this misconception, for in directing the verdict for the government, he stated: "Under all the facts and circumstances that have been proven in this matter, the Court is of the opinion that while the evidence as to the fraud in this case is contradicted, yet the evidence in connection with the validity of this contract is so conclusive in the Court's mind that even if you gentlemen of the jury were to return a verdict in favor of the defendant on the issue of the validity of

the law, so the Court instructs you that on this contract, the Court would not allow it to stand, couldn't allow it to stand under that issue you will return a verdict in favor of the plaintiff in this case as to the validity of the contract."

It is true, as argued by the government, that the Fifth Amendment to the Federal Constitution does not prohibit a landowner and the government from agreeing as to what is just compensation for property taken. Albrecht v. United States, 329 U.S. 599, 67 S.Ct. 606. In case of a valid agreement, the amount fixed is binding. Danforth v. United States, 308 U.S. 271, 282, 283, 60 S.Ct. 231, 84 L.Ed. 240. This is true, even if there be condemnation proceedings. Wachovia Bank & Trust Co. v. United States, 4 Cir., 98 F.2d 609, 612.

But is does not follow that an option contract, if procured by fraud upon the owner of the land, would be binding upon him. Indeed, as we read Muschany v. United States, 324 U.S. 49, 57, 58, 65 S.Ct. 442, 447, 89 L.Ed. 744, there is an intimation to the contrary. There, the Supreme Court said that the case came before it "without any suggestion of fraud or unfairness such as would justify holding the contracts invalid"; and that, inasmuch as the trial court's findings on the issues of fraud, misrepresentation and duress were supported by substantial evidence and these issues were not argued before the Supreme Court, an independent examination of these issues would not be undertaken under the guise of determining "just compensation."

As was said by Chief Justice Shields of the Supreme Court of Tennessee, in Richardson v. Vicks, 125 Tenn. 532, 540, 145 S.W. 174, 176, "It is elementary law, of universal application, that fraud renders all contracts voidable, ab initio, at the option of the defrauded party, when diligently exercised, in the absence of intervening rights of innocent third parties."

In a condemnation case, where there is substantial evidence that fraud was perpetrated by an agent of the United States in procuring an option on land taken for public use, where the issue involved is just compensation, there seems no reason whatever for departing from the accepted principle. There is substantial evidence that, as soon as the fraud was discovered, the owner of the land made his position clear that he did not intend to be bound by the option. He was entitled to go to the jury upon the issue of fraud in the procurement or mistake resulting from misrepresentation; and, if the jury should find that issue in his favor, to have a verdict rendered by the jury fixing just compensation for the land taken.

Accordingly, the judgment of the district court is reversed; and the cause is remanded for a new trial.