UNITED STATES of America, Appellant,

v.

Julian G. ROGERS, Appellee (two cases).
UNITED STATES of America, Appellant,

v.

Julian G. ROGERS and Margaret H. Rogers, Appellees.

No. 14086.

United States Court of Appeals
Sixth Circuit.

Jan. 27, 1961.

---

Joseph Kovner, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Attorneys, Department of Justice, Washington, D. C., and Jean L. Auxier, U. S. Atty., Lexington, Ky., on brief, for appellant.

William R. Bagby,.Lexington, Ky., for appellee.

Before MILLER, CECIL and WEICK, Circuit Judges.

CECIL, Circuit Judge.

This is an appeal from judgments of the United States District Court for the Eastern District of Kentucky. Julian G. Rogers filed three separate actions in the District Court for the refund of income taxes for the years 1947, 1948 and 1949. In 1949 he filed a joint return with his wife Margaret H. Rogers and she is a co-plaintiff with him for the recovery of taxes for that year. The three cases were consolidated for trial and were tried to a jury resulting in verdicts for the taxpayers in all three cases. Judgments in the sum of $418,566.46 were entered upon the verdicts and the government appealed.

Julian Rogers sometimes hereafter referred to as the taxpayer was in the livestock business for the tax years in question and had been in such business for many years prior thereto. He bought cattle, hogs and lambs from farmers and at the auction markets in Kentucky. He immediately sold the livestock so purchased, mostly to independent or marginal meat packers in Eastern cities. He made some sales to commission merchants in terminal markets. He did business on a very large scale and was one of the largest single purchasers of livestock in the auction markets. His gross sales for the years 1947, 1948 and 1949 were in excess of $29,000,000, $32,000,000 and $23,000,000, respectively. During the tax years involved here, he purchased as much as 50 per cent of the fat cattle sold at auction. He bought the livestock in his own name and was required to pay for it in 72 hours or at most in seven days. Shipment was made by rail and truck and it took from two and a half to five days for a load to reach its destination. His best customers paid within a week to ten days but many delayed payment as long as six months. Some never paid. Late in 1946 or early 1947 Rogers had about $1,000,000 outstanding in accounts receivable from his marginal-packer customers. At this time he believed that there was danger of a depression or a severe decline in business.

Rogers was confronted with four risks of loss in his livestock business which may be stated briefly as follows: Price declines in transit, shrinkage and damage in transit, terminal market losses and accounts receivable losses. The first three were natural and ordinary hazards

of the business. The danger of loss of accounts receivable increased with any decline in general business conditions. He estimated his losses through price declines for the years 1947, 1948 and 1949 at approximately $163,000. The total losses in accounts receivable for the same years were $964,000. More than two-thirds of this was lost through one company, The American Packing Company, of Hoboken, New Jersey.

Mr. Rogers had suffered severe business reverses on at least two prior occasions and he was desirous of protecting himself against another such reverse. He discussed his situation with Mr. Weiss, of the Baxter International Economics Research Bureau. He described the nature of his business and the risks with which he was confronted and told him that he was in a seventy to ninety per cent tax bracket. Mr. Weiss advised Rogers to enter the commodities futures market on a large scale as "the only means of insurance" against losses in his livestock business.

Acting upon this advice Mr. Rogers sold a large amount of his $300,000 of investments in stocks and securities and entered the commodities futures market in a substantial way. He had dealt in a modest way in commodity futures during the years 1945 and 1946. Gains from these transactions were treated for income tax purposes as capital gains. In the beginning of 1947 Mr. Rogers instructed his accountant to treat gains and losses from commodity futures transactions as gains and losses in ordinary income.

Mr. Rogers dealt with two brokerage firms in Lexington, Kentucky, and traded in futures in wheat, oats, corn, lard, soybeans, cotton and eggs. He bought and sold on the advice of Mr. Weiss. They held frequent telephone conversations. Sometimes these were daily. He bought and sold in varying quantities, from day to day, taking short and long positions. Futures were closed out daily, weekly and monthly. For the three years in question there were over eighteen hundred opening contracts in futures commodi-ties. The total value of such transactions in 1947 exceeded eight million dollars. There was a similar pattern of trading in the other two years. The taxpayer's profits or losses on these transactions resulted from fluctuations in the prices of futures. The transactions for the years here under consideration resulted in losses and for tax purposes the taxpayer treated them as losses of ordinary income.

The Commissioner of Internal Revenue determined that the losses were from capital investments and on April 26, 1956 issued notices to the taxpayers of the deficiencies which are the subject of these actions.

The parties entered into stipulations as follows:

"1. There is no dispute as to the amount of tax and interest in controversy in any of the foregoing three cases (and that refers to the 1947 case, the 1948 case and the 1949 case) and further that the amount of the refund, if any, due the plaintiff or plaintiffs can be determined by the parties after the jury has returned its verdict.

"2. That the plaintiff Julian G. Rogers' transactions in the commodities futures market during the pertinent period did not constitute 'true' or technical hedges as the term 'hedge' is defined in General Counsel's Memorandum 17322, CB XV–2, page 151 et seq."

The appellant contends that the trial judge erred as a matter of law in submitting the case to the jury.

The law of the cases as adopted by the trial judge is stated in an interrogatory which he submitted to the jury in each of the cases. The interrogatories were identical and we will refer to only one of them. It consisted of three parts. The first referred to the nature of the taxpayer's business and the hazards of loss to which he was subjected. The second provided that he must have entered the commodities futures market in good faith for the sole

purpose of protecting himself from the hazards of loss in the business. The third contains the essence of the law and reads as follows: " . . . and further find from the evidence that the dealings by the Plaintiff in Commodity Futures afforded a reasonable means for protection from such losses, in whole or in part, and in that respect and for that reason had such direct relation to the hazards of his business of purchasing and selling livestock as constituted his dealings in Commodity Futures an integral part of his livestock business?"

This statement of the law contains two essential elements, one, there must be a direct relation to the hazards of the business of buying and selling livestock and, two, the dealings in commodity futures must constitute an integral part of the livestock business.

One of the cases relied on by the trial judge and cited by counsel on both sides is known as the Corn Products case, Corn Products Refining Co. v. Commissioner, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29. This is the leading case on the subject. Corn Products Company, the taxpayer, is a manufacturer of products made from grain corn. In 1937 it began buying corn futures " 'as a part of its corn buying program' and 'as the most economical method of obtaining an adequate supply of raw corn' without entailing the expenditure of large sums for additional storage facilities." Its method of operation as described at page 48 of 350 U.S., at page 22 of 76 S.Ct. was as follows: "At harvest time each year it would buy futures when the price appeared favorable. It would take delivery on such contracts as it found necessary to its manufacturing operations and sell the remainder in early summer if no shortage was imminent. If shortages appeared, however, it sold futures only as it bought spot corn for grinding. In this manner it reached a balanced position with reference to any increase in spot corn prices. It made no effort to protect itself against a decline in prices." The company made a profit in excess of $600,000 in corn futures in

1940 and in 1942 it lost slightly over $100,000. The taxpayer reported these gains and losses as ordinary profit and loss from manufacturing operations. It later sought to amend its returns and treat them as arising from the sale of capital assets. In support of this position, it claimed that its trading in futures was separate and apart from its manufacturing operations.

As stated at page 50 of 350 U.S., at page 23 of 76 S.Ct., "Both the Tax Court and the Court of Appeals found petitioner's futures transactions to be an integral part of its business designed to protect its manufacturing operations against a price increase in its principal raw material and to assure a ready supply for future manufacturing requirements."

It was held by the Supreme Court that these findings presented questions of fact. On this authority the trial judge in the case at bar considered that, if the taxpayer entered the futures market in good faith, to protect himself from losses in his business, a question of fact was presented for the jury to determine, whether it was an integral part of his business. In this respect it must be borne in mind that the Corn Products Company was trading in futures in corn which was the very basis of its manufacturing business.

In affirming the Tax Court and the Court of Appeals in their findings that the Corn Products Company's dealings in futures was an integral part of its business, the Court very clearly outlined a basic rule, 350 U.S. at page 50, 76 S.Ct. at page 23: "We find nothing in this record to support the contention and Corn Products' futures activity was separate and apart from its manufacturing operation. On the contrary, it appears that the transactions were vitally important to the company's business as a form of insurance against increases in the price of raw corn. Not only were the purchases initiated for just this reason, but the petitioner's sales policy, selling in the future at a fixed price or less, continued to leave it exceedingly

vulnerable to rises in the price of corn. Further, the purchase of corn futures assured the company a source of supply which was admittedly cheaper than constructing additional storage facilities for raw corn. Under these facts it is difficult to imagine a program more closely geared to a company's manufacturing enterprise or more important to its successful operation."

The District Judge also relied on United States v. Bondurant, 6 Cir., 245 F.2d 265, as authority for submitting the case to the jury. (267a Appellant's Appendix.) The Judge recognized that it was not analogous and aside from the fact that the issue presented a question of fact for a jury, it has no bearing on the case at bar. Here the taxpayer was a cotton shipper whose principal business was buying and selling cotton. In addition to his regular cotton shipping business he wanted to invest in cotton in such a way as to make any profit resulting therefrom a capital gain. His tax counsellor advised him that this could be done if he kept it separate in every way from his regular business. The similarity between his cotton shipping business and his investment cotton venture gave rise to the claim, on the part of the government, that profits from the investment venture were ordinary income. Whether he had sufficiently segregated the investment business so as to distinguish it from his regular business was held to be a jury question.

In Trenton Cotton Oil Co. v. Commissioner of Internal Revenue, 6 Cir., 147 F.2d 33, at page 35, the court said:

"Losses from counter contracts made by manufacturers to protect themselves against fluctuations of markets in the purchase of raw material in advance of use, or sales of manufactured goods in advance of production, are treated under the Internal Revenue Statutes as ordinary business expenses, and gains from such sources are treated as ordinary income. Ben Grote v. Com'r, 41 B.T.A. 247; G.C.M. 173.-22, XV–2, Cum.Bull. 151 (1936).

Purchases and sales against price fluctuations are insurance against loss and such transactions have a direct relationship to profit realized or loss sustained in the conduct of a business.

"Before such a loss may become allowable as a business expense, it must be made to appear that a contract has been entered into for the sale and delivery of a product at a future date and that there is a counter contract for the purchase of the same product for future delivery or one so akin to it that it affects the price of the former. The whole theory is that when the price goes up or down the gain on one transaction will offset the loss on the other. The price relationship, as shown by the evidence, between crude and refined oil is so intimate that the purchase of the latter for future delivery may be used as an insurance against risk of loss on the former sold for future delivery and the same is true as to the price relationship between refined oil and cottonseed."

See also Commissioner of Internal Revenue v. Farmers & Ginners Cotton Oil Co., 5 Cir., 120 F.2d 772, at page 774, where the court said: "A hedge is a form of price insurance; it is resorted to by businessmen to avoid the risk of changes in the market price of a commodity. The basic principle of hedging is the maintenance of an even or balanced market position. To exercise a choice of risks, to sell one commodity and buy another, is not a hedge; it is merely continuing the risk in a different form. That is what the taxpayer did in this case. It did not retain its crude oil and sell refined; it sold crude and bought refined when it had no actual commodity on hand or future commitments to be protected from price variations."

A thread that runs through all of the cases is that there must be a direct relation between the product that is the basis of the taxpayer's business

and the commodity futures in which he deals for protection. There must also be a relation between the prices of the product and the commodity. In order to really secure protection with some degree of certainty and without indulging in pure speculation the prices of the commodity futures must move up and down closely with the prices of the product of the business.

The parties stipulated that Mr. Rogers' transactions in commodity futures were not a "true hedge" against losses in his livestock business. The implication is that these dealings constituted some kind of a hedge. However, no theory is advanced as to how his method of operation would produce a hedge or any protection against the hazards of loss to which he was subjected in the business of buying and selling livestock. Neither are there any authorities cited to substantiate the position of the taxpayer.

The evidence does not disclose any relationship between Mr. Rogers' livestock business and the commodity futures in which he dealt. Neither does it show any relationship between the prices of those commodities and livestock. Furthermore, the evidence shows that he bought and sold commodity futures without any regard for his purchases and sales of livestock.

There was nothing scientific about his methods. There was no pattern of operation whereby losses through transactions in the commodity futures market might be considered as losses of ordinary income as recognized by the cases above cited.

■ Considering the evidence in the most favorable light to the plaintiff it would support a finding of the jury that Mr. Rogers honestly and in good faith entered the commodity futures market for the purpose of making a profit to offset his anticipated losses in his livestock business. Or, to put it another way, to protect himself from the hazards of the business. Good faith is not enough. The business of dealing in commodity futures must constitute an integral part of his livestock business. It cannot become such a part of his business just because he has an honest intention to make it so.

The evidence shows that any gains through declines in commodity futures to offset losses through the hazards of the livestock business would be purely accidental. In dealing in commodity futures the plaintiff took on an additional risk. Instead of gaining in the commodity market he lost. Fortunately for him he did not lose through the hazards of his livestock business. The fact that he lost in the one and gained in the other was not due to any balancing relationship between the two business ventures.

It is said that losses from dealings on commodity exchanges fall into three general classes: " * * * hedges, wagering contracts, and legitimate capital investments. Losses from true hedges are allowed in full. * * * Capital losses are allowed only to the extent of $2,000 plus the gains from sales or exchanges." Commissioner of Internal Revenue v. Farmers & Ginners Cotton Oil Co., supra; United States v. New York Coffee & Sugar Exchange, 263 U.S. 611, 44 S.Ct. 225, 68 L.Ed. 475.

We conclude that plaintiff's dealings in commodities were purely speculative and fell in the class of legitimate capital investments. There is no evidence upon which a jury could base a finding that these investments were an integral part of the plaintiff's livestock business. The government's motion for a directed verdict should have been granted.

The judgments are reversed and the cases remanded to the District Court with instructions to dismiss the complaints.

SHACKELFORD MILLER, Jr., Circuit Judge (dissenting).

I am of the opinion that the judgments in these cases should be affirmed on the authority of Corn Products Refining Co. v. Commissioner, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29.

As pointed out in the opinion in that case, it is settled law that hedging transactions are essentially to be regarded as insurance rather than a dealing in capital assets and that gains and losses therefrom are ordinary business gains and losses. I recognize that in the present case it was stipulated by the parties that the taxpayer's transactions in the commodity futures market during the taxable years in question did not constitute "true" or technical hedges as the term "hedge" is defined in General Counsel's Memorandum 17322. But the transactions in commodity futures in the Corn Products Refining Co. case were not "true hedges," and yet the resulting gains and losses were held to constitute ordinary income and ordinary deductions, for the reason that they were vitally important to the company's business as "a form of insurance" against increases in the price of raw corn. Accordingly, the issue in the present case is not whether taxpayer's dealings in commodity futures constituted a "true hedge" but whether they constituted an integral part of his livestock business. Corn Products Refining Co. v. Commissioner, supra, 350 U.S. 46, 50–51, 76 S.Ct. 20, 100 L.Ed. 29; Mansfield Journal Co. v. Commissioner, 6 Cir., 274 F.2d 284, 286.

As stated in the Corn Products Refining Co. case, this is essentially a factual question. The District Judge submitted this factual question to the jury by means of an interrogatory. Under this interrogatory, in order for the taxpayer to recover, the jury was required to find from the evidence that the taxpayer, in good faith, "engaged in purchasing and selling Commodity Futures with the sole and only purpose and intention of affording himself protection" from his business losses and that it "afforded a reasonable means for protection from such losses, in whole or in part, and in that respect and for that reason had such direct relation to the hazards of his business of purchasing and selling livestock as constituted his dealings in Commodity Futures an integral part of his livestock business." I am of the opinion, and the parties seem to agree, that this interrogatory correctly presented the issue. It was not objected to by Government counsel. On this factual question the jury found for the taxpayer.

Accordingly, there is no legal issue involved in this appeal. It was purely a question of fact for determination by the jury under proper instructions from the Court. Unless the evidence was insufficient to take this factual issue to the jury, the judgment should be affirmed. Corn Products Refining Co. v. Commissioner, supra.

The Government put in evidence the testimony of three expert witnesses who testified to the nonrelationship between the risks of loss in taxpayer's livestock business and his trading in commodity futures. In their opinion, the taxpayer could not protect himself against losses in his livestock business by his tradings in commodity futures. These witnesses, however, were not men with practical experience in the livestock business.

The taxpayer, in his behalf, introduced the testimony of a Mr. Weiss, who was the senior partner of a "Wall Street" firm of investors and business and financial advisors. Mr. Weiss began his business career in Wall Street in 1928, became a partner in a produce exchange, and later became affiliated with several firms, including the International Economic Research Bureau, which later became the Baxter International Economic Research Bureau, of which Mr. Baxter was the head. He was with the Baxter firm from about 1937 to 1955, becoming second to Mr. Baxter before leaving that firm. The Baxter firm did considerable work with such firms as Montgomery-Ward, Sears-Roebuck, Procter and Gamble, W. T. Grant Co., and Continental Can Co., and also had clients engaged in the packing industry.

Appellee was a client of the Baxter firm and had been in contact with it once or twice during 1945 or 1946. Mr. Weiss testified that during the early part

of January 1947 appellee had a lengthy conversation with him over the phone about his business and its hazards. The taxpayer had at the time about $1,000,-000 of outstanding accounts receivable and was of the opinion that there was danger of a business depression or a severe decline in business in 1947. He was dealing with second, third and fourth-rate packers, who in the event of a business depression probably couldn't pay. The taxpayer had gone broke twice before and asked Mr. Weiss if his organization could suggest some method to help him. Mr. Weiss stated that he would like to discuss it with others in his organization. After some ten days or two weeks he called the taxpayer and told him that his organization had two alternative suggestions, the first being to insure the accounts receivable, and the second being to enter the commodity futures market on a substantial scale. The taxpayer stated that he had already tried to insure the accounts receivable, but that the cost was prohibitive. Accordingly, the second suggestion was adopted and followed.

Mr. Weiss testified that in his opinion as a financial and business advisor, going into the commodity futures market would provide the taxpayer protection against the risks in the livestock business; that in view of the high federal income tax bracket applicable to the taxpayer he would not have advised him to go into the commodity futures market under ordinary circumstances, but the advice was given because of the many hazards of his livestock business, and that it was their view, upon which the decision was made, that the taxpayer's entrance into the commodity futures market was a reasonable means for the protection of the taxpayer against the risks and hazards of his livestock business. Mr. Weiss also testified that he and the taxpayer worked together in the matter, the taxpayer continually giving him his picture of the livestock market; that their consistent pattern was to follow livestock prices very closely and to make commitments in conjunction with livestock prices; that if livestock prices rose, they took a position in accordance, if livestock prices declined they took a position accordingly; that they consistently adhered to a policy of making commitments in those commodities associated with the farm, livestock and farm products which generally went into feed, rather than metals and sugar, which they considered as having nothing to do with the taxpayer's livestock business. In his opinion, the losses suffered by the taxpayer in the commodity futures in 1947, 1948 and 1949 were solely and only the result of the protection and insurance against the hazards in his livestock business, like paying the premium on an insurance policy. He testified that the purpose of their advice and the procedure under it was to try to minimize the risks and hazards of taxpayer's livestock business, and in his opinion the commitments made in commodity futures were an integral part of the taxpayer's livestock business.

It is pointed out that the operation of the plan had the following practical result. In the early part of the year the taxpayer would sell short for delivery later in the year. If the price of the futures went down, he made profits. If the price of the futures went up, he had losses. In the event of an economic decline the taxpayer would have losses in his accounts receivable, but would have offsetting profits in his commodity futures. If business improved instead of declining, the taxpayer would have a loss in his commodity future, but the marginal packers would be able to liquidate taxpayer's accounts receivable. Losses in the futures was the insurance premium for the protection of the accounts receivable.

I recognize that Mr. Weiss's testimony is not uncontradicted and may not be convincing to the Court. The majority opinion expresses such a view. It contains persuasive arguments in sup-

port of its holding that taxpayer's commitments in commodity futures were not an integral part of his livestock business. But it is not for the trial court or for this Court to decide whether under the conflicting testimony they did or did not constitute an integral part of his livestock business. It is well settled that "a verdict may not be directed for a defendant merely because the trial judge feels that, should the jury find in plaintiff's favor, he would regard it as his duty in the exercise of a sound judicial discretion, to set the verdict aside." O'Donnell v. Geneva Metal Wheel Co., 6 Cir., 183 F.2d 733, 739, rehearing denied 6 Cir., 190 F.2d 59, certiorari denied 341 U.S. 903, 71 S.Ct. 612, 95 L.Ed. 1342; Heatherly v. Southern Ry. Co., 5 Cir., 106 F.2d 894, 895. This Court said many years ago, "The test is whether there is such an utter absence of substantial evidence as to make it his duty, as a matter of law, to set the verdict aside independently of the exercise of discretion, and without reference to how greatly the court may think the conflict in testimony to preponderate in favor of defendant." Begert v. Payne, 6 Cir., 274 F. 784, 788, and restated in Scott v. United States, 6 Cir., 161 F.2d 1009, 1012. I do not think that we are justified in completely discrediting and rejecting Mr. Weiss's testimony. That is the province of the jury. Begert v. Payne, supra, 6 Cir., 274 F. 784, 787. Unless the evidence is of such a character that reasonable men in a fair and impartial exercise of their judgment would not reach different conclusions, the case should be submitted to the jury. Bailey v. Central Vermont Ry., 319 U.S. 350, 353, 63 S.Ct. 1062, 87 L.Ed. 1444. Mr. Weiss's testimony was not so unreasonable or improbable as to cause it to be unanimously rejected by reasonable men. The jury obviously considered it reasonable and convincing. I think it was sufficient to take the case to the jury.

I would affirm the judgments.