Estate of Hazel S. Laughlin, Deceased, Donald M. Laughlin, Executor, and Donald M. Laughlin v. Commissioner.
Estate of Laughlin v. Commissioner
Docket No. 3157-69.
United States Tax Court
T.C. Memo 1971-52; 1971 Tax Ct. Memo LEXIS 272; 30 T.C.M. (CCH) 227; T.C.M. (RIA) 71052; March 29, 1971, Filed. Ralph E. Davis and William J. Larned, Suite 5200, One First Mat'l Plaza, Chicago, Ill., for the petitioners. Seymour I. Sherman, for the respondent. 228 SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in petitioners' income tax return for the calendar year 1964 in the amount of $9,986.57. The only issue for decision is whether certain transactions in soybean futures by petitioner were hedges or an integral part of *273 petitioner's trade or business resulting in ordinary losses or whether such transactions were capital in nature with the resulting loss being a capital loss. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner, Donald M. Laughlin, (hereinafter referred to as petitioner) is an individual residing in Minonk, Illinois. During 1964 petitioner was married to Hazel S. Laughlin who died on January 3, 1965. On January 19, 1965, petitioner was appointed as executor of her estate. He filed a joint Federal income tax return with his wife's estate for the calendar year 1964 on the cash receipts and disbursements basis with the district director of internal revenue at Springfield, Illinois. Petitioner is and has been for many years engaged in the trade or business of farming. Since 1955 his farming activity has been limited to the production and sale of corn and soybeans. He operates three farms totaling approximately 2,000 acres all of which are located in Illinois. The planting of only one or two crops by a particular farmer is becoming more prevalent in farming operations and such operations require more technological skills and knowledge than *274 did the diversified crop method of farming. Petitioner's gross income from his farming operations for the year 1964 was in excess of $114,000. From 1960 through 1964 petitioner realized the following dollar amounts from sales of corn and soybeans: Year
Corn
Soybeans
1960
$20,222.18
$21,266.74
1961
40,641.52
3,684.13
1962
47,793.66
29,348.61
1963
52,655.47
34,522.84
1964 60,585.04
42,018.69
Total
$221,897.87
$130,841.01
In the years just prior to 1964 petitioner had planted his farms about half and half in soybeans and corn. In the petitioner's locality corn is normally planted in the latter part of April and the first part of May and soybeans are normally planted in May and the first part of June. Normally the soybean plants come out of the ground in July and the soybeans are harvested in the latter part of September or October. Generally petitioner did not sell the harvested soybeans in September or October since normally the price of the soybeans was lower in the harvesting season than at a later time. Petitioner had storage capacity for 80,000 bushels of soybeans or grain. Usually he stored the soybeans he harvested each year and sold *275 them by degrees throughout the year as the seasonal increases in the price of the beans occurred. Soybeans can be stored for several years and petitioner has on occasion held his soybeans for 2 or 3 years. In 1963 petitioner was planning on planting all his farmland in 1964 in soybeans. The cost of soybeans had been moving upward and world consumption was increasing. Soybeans are less expensive and require less technical know-how to raise than corn. If soybeans were planted exclusively, there would be certain drawbacks. Since soybeans are planted later than corn, if the planting weather was not good for soybeans, it would be past the normal planting season for corn. Also as a general rule the price of soybeans fluctuates more violently than that of corn. If petitioner had planted all of his land in soybeans in 1964, he estimated that his share of the crop would have been approximately 50,000 bushels, assuming no crop failure. In the last of 1963 the so-called "salad oil scandal" began to unfold. When by corn planting time in 1964 the price of soybeans had dropped substantially and the extent of the adverse effect of the "salad oil scandal" on the soybean market could not be actually *276 determined, petitioner followed his custom of previous years and planted half his land in corn and half in soybeans. Petitioner planted soybeans on acreage sufficient to produce a 1964 crop of approximately 40,000 bushels of which petitioner was entitled (after his sharecroppers had received their share) to approximately 20,000 bushels. One of the risks inherent in farming is the possibility of a poor crop resulting from adverse weather conditions such as too much rain at planting time, too little rain during the growing season, or a severe insect infestation. The only insurance 229 covering a poor crop or crop failure available for purchase by a farmer is damage to a crop from hail. Petitioner's farms are located in the area of the United States sometimes referred to as the "bean belt." If petitioner's soybean crop was poor in a particular year because of weather conditions or insect infestation, it would be highly likely that other farmers in the "bean belt" would also have a poor crop. Since the majority of the soybeans grown in this country are grown in the "bean belt," poor soybean crops by the farmers in the "bean belt" would mean a lower supply of beans which would generally *277 result in a rise in the price of soybeans and soybean futures. For the years 1960 through 1967 petitioner entered into the following futures transactions: Date of
Date of
Gain or
Bushels
Commodity
Purchase
Sale
(Loss)
1960
No futures transactions
1961
10,000
May, Corn
1-31-61
3-29-61
$1,173.50
20,000
May, Soybeans
1-31-61
3- 2-61
6,328.00
10,000
May, Soybeans
1-31-61
3-29-61
4,139.00
1962
No futures transactions
1963
20,000
May, Soybeans
11-23-62
4-18-63
1,179.00
30,000
July, Soybeans
4-18-63
6-25-63
2,693.50
30,000
November, Soybeans
7- 3-63
9-23-63
606.00
10,000
November, Soybeans
7- 3-63
9-24-63
(448.00)
20,000
May, Soybeans
8-13-63
9-23-63
4,966.50
1964
20,000
May, Soybeans
10- 7-63
[1] 5- 4-64
(7,746.00)
20,000
May, Soybeans
10-11-63
[2] 5-18-64
(8,196.00)
10,000
July, Soybeans
1-28-64
[3] 6-15-64
(2,398.00)
1965
No futures transactions
1966
[4]
March, Corn
10-12-65
1966
( 69.00)
[4]
December, Corn
10-20-65
1966
( 544.00)
1967
No futures transactions
*278 Prior to 1964 petitioner reported all his futures transactions as capital transactions, the gains being reported as capital gains. When a person purchases a contract for future delivery of soybeans as petitioner did in October 1963, with respect to the 40,000 bushels for May delivery and in January 1964 with respect to the 10,000 bushels for July delivery, the transaction must be closed 10 days before the last trading day of the future month, which is usually about the 20th day of the month. The transaction may be closed either by a commitment 10 days prior to the last trading date of the month to accept delivery of the soybeans, or by the sale of the contract usually at a gain or loss. Petitioner never took delivery of the soybeans under any contracts for future delivery which he purchased. When a price increase of soybeans occurs because of a poor soybean crop, the price of soybean futures usually also increases but not proportionately to the percentage of the amount the crop harvested is below normal. Petitioner on his Federal income tax return for 1964 reported his $18,340 loss on the contracts for future delivery of soybeans which he sold in May and June as a 230 farm *279 expense in schedule F under the designation "hedging losses (grain futures)." In the statutory notice of deficiency, respondent disallowed this claimed deduction and treated the total of the losses incurred in the amount of $18,340 as a capital loss. Opinion Petitioner takes the position that his losses in 1964 from the sale of the contracts he purchased in October 1963 and January 1964 for future delivery of soybeans are ordinary losses sustained in his trade or business because such losses are either hedging losses or losses resulting from transactions which were an integral part of his business within the holding of Corn Products Refining Co. v. Commissioner, 350 U.S. 46 (1955). Respondent's position is that petitioner's futures transactions in soybeans in 1963 and 1964 were neither hedges nor transactions vitally important to petitioner's business as a form of insurance within the rule announced in the Corn Products case. Ordinarily contracts for future purchases or sale of commodities are capital assets within the definition of section 1221 [1] and the gain or loss resulting from dealing in such contracts is capital gain or loss. However, it has long been recognized *280 that where commodity futures are bought or sold as a hedge or insurance against fluctuations in the price of a commodity in which the taxpayer has a fixed position, the resulting gain or loss is an ordinary gain or loss. L. M. Muldrow, 38 T.C. 907, 912-913 (1962). [2]
*281 While recognizing that the term "hedging" does not lend itself to a precise definition, Kenneth S. Battelle, 47 B.T.A. 117 (1942), we have consistently held that hedging is a form of price insurance and that the essence of hedging is the "maintenance of an even or balanced market position. Stewart Silk Corporation, 9 T.C. 174, 178 (1947). In that case we pointed out as follows with respect to the type of transactions that constitute a hedge (at pp. 178, 179): Hedging transactions in commodities may take several different forms, depending upon the particular circumstances in which the hedger finds himself and the type of risk he seeks to avoid. For example, if a manufacturer or processor of raw materials is short on inventory and makes sales of his finished product for forward delivery, the appropriate hedging transaction in that instance would be the purchase of raw material futures at or about the time he makes the sale. See G.C.M. 17,322, XV-2 C.B. 151, 152. It serves to fix the cost of raw materials in the finished product and to assure him a certain margin of profit, regardless of market fluctuations. * * * On the other hand, if a manufacturer *282 wishes to hedge against either the purchase of spot goods or actuals already on hand in inventory, the appropriate transaction would be, not the purchase, but the sale of futures. * * * * * * And, we do not understand that in order to constitute a true hedge it was necessary for petitioner to cover its entire inventory and offset every purchase of actuals with a corresponding futures contract. Actuals already on hand or purchased and added to inventory may be hedged entirely or in part; and if only in part, the protection against market fluctuations is obtained pro tanto. * * * In Corn Products Refining Co. v. Commissioner, supra, the Court recognized that for 231 the gain or loss from dealing in commodity futures to constitute ordinary income or loss instead of capital gain or loss, the transaction must constitute an integral part of the taxpayer's business and be a form of insurance against a risk of that business, even though not all risk of the business would be covered by the transactions. In that case the Court stated at 50: Both the Tax Court and the Court of Appeals found petitioner's futures transactions. to be an integral part of its business designed *283 to protect its manufacturing operations against a price increase in its principal raw material and to assure a ready supply for future manufacturing requirements. * * * We find noting in this record to support the contention that Corn Products' futures activity was separate and apart from its manufacturing operation. On the contrary, it appears that the transactions were vitally important to the company's business as a form of insurance against increases in the price of raw corn. Not only were the purchases initiated for just this reason, but the petitioner's sales policy, selling in the future at a fixed price or less, continued to leave it exceedingly vulnerable to rises in the price of corn. Further, the purchase of corn futures assured the company a source of supply which was admittedly cheaper than constructing additional storage facilities for raw corn. Under these facts it is difficult to imagine a program more closely geared to a company's manufacturing enterprise or more important to its successful operation. * * * Petitioner also makes much of the conclusion by both the Tax Court and the Court of Appeals that its transactions did not constitute "true hedging." It is true *284 that Corn Products did not secure complete protection from its market operations. Under its sales policy petitioner could not guard against a fall in prices. It is clear, however, that petitioner feared the possibility of a price rise more than that of a price decline. It therefore purchased partial insurance against its principal risk, and hoped to retain sufficient flexibility to avoid serious losses on a declining market. The facts in the instant case do not support petitioner's position that his futures transactions were an integral part of his farming business or that they served to furnish insurance against any risk of that business. Petitioner does not contend that he was attempting to insure himself against a rise or decline in prices of soybeans, but rather that his transactions in the futures market were designed to insure him against a poor crop. He contends that he purchased contracts for future delivery of soybeans or "went long" in his futures transactions so that he might profit from the rise which might result in the price of soybeans if he and other farmers experienced a bad crop by the sale of the futures contracts at a profit in addition to receiving a higher price *285 for the soybeans he raised. Petitioner stated that at the time he purchased the contracts for delivery in May of 40,000 bushels of soybeans and delivery in July of 10,000 bushels, he was planning to plant only soybeans on his farm in the planting season of May and early June 1964. Petitioner was probably also holding some of his 1963 October harvest of soybeans in storage. Therefore petitioner's purchase for future delivery was exactly the opposite of the type of transaction he would have entered into to insure the risk of a decrease in the price of the soybeans he was planning to plant or those, if any, he held in storage. See Kenneth S. Battelle, supra (47 B.T.A. at 126). Petitioner contends, however, that since the risks to which a farmer is subject include a poor crop because of bad weather or insect infestation as well as price fluctuations, his futures transactions did insure him against a substantial risk of his business and therefore his losses from the transactions resulted in ordinary losses under the holding of Corn Products Refining Co. v. Commissioner, supra. The facts in this record do not support petitioner's position. The facts here *286 show that the futures contracts purchased by petitioner did not in fact protect any risk of petitioner's farming business. Obviously the contracts did not protect the price of soybeans stored or soybeans to be grown by petitioner since they were for delivery to petitioner of soybeans in the future and not a short sale of soybeans to fix a price at which petitioner could in the future deliver soybeans. Also, obviously, the purchasing of the futures would in no way affect whether petitioner's crop or the crop of other farmers was good or bad. The only possible protection the contracts might give petitioner was to provide him with soybeans at a predetermined price at sometime prior to May 20, 1964, for 40,000 bushels and sometime prior to July 20, 1964 for 10,000 bushels if petitioner chose to take delivery of the soybeans instead of closing out the contracts. Since petitioner had made no commitment for sales of 232 soybeans and for all this record shows had never committed any part of his crop for sale until he made a spot sale, petitioner's right to have delivery of soybeans in May and July did not protect petitioner from any possibility of having to buy soybeans at a higher May *287 or July price to meet any commitment. For reasons hereafter pointed out, we consider from the evidence in this record that petitioner in October 1963 and January 1964 bought the contracts for the 50,000 bushels of soybeans for May and July delivery as a speculation and therefore his losses on closing out the contracts were capital losses. However, even if we accepted petitioner's contention that he intended the purchases to be insurance against the risk of a poor soybean crop in 1964, our conclusion that the losses on the closeout of the contracts were capital losses would remain the same since in our view the futures purchases in fact furnished petitioner no insurance against a poor crop. Petitioner's planting season for soybeans was in May and early June of each year. The soybeans appeared above the ground in July and were harvested in October. Petitioner's own testimony is that he could not actually know whether his crop would be good or bad until harvest time in October but that the weather during the planting season in May and early June and the nature of the plants when they appeared above the ground in July would give more indication of the crop to be expected. However, *288 petitioner's 1963 purchases of 40,000 bushels of soybeans for May delivery made it necessary that he take delivery or close out the contract by May 20, 1964, before the end of the 1964 planting season and before he could know what the weather for the complete planting season would be. The remaining 10,000 bushels were purchased by petitioner in January 1964 for July delivery. This delivery had to be taken or the contract closed out by July 20, 1964, before the end of the season for the soybean plants to appear above the ground. It is therefore apparent that irrespective of petitioner's intent in the purchase of the futures contracts, these contracts in fact protected no risk of petitioner's business, either as to price or quantity of crop. As was pointed out in United States v. Rogers, 286 F. 2d 277 (C.A. 6, 1961), where dealing in commodity futures does not in fact constitute an integral part of a taxpayer's business it cannot become a part of his business "just because he has an honest intent to make it so." However, on the basis of this record, we conclude that petitioner's intent at the time of the purchase of the soybean futures was to enter into a speculative transaction *289 and it was only viewing his actions in retrospect that led him to the belief that these transactions should be considered as an integral part of his business in the nature of insurance. The record shows that in November 1962 and April 1963, petitioner purchased contracts for future delivery of 50,000 bushels of May and July (1963) soybeans which he closed out in April and June 1963 at a total profit of $3,872.50. Petitioner in July 1963 purchased contracts for future delivery of 30,000 bushels of soybeans in November and another contract for 10,000 bushels of soybeans for November delivery. He closed out these contracts in September, one at a small profit and the other at a small loss. On August 13, 1963, petitioner purchased a contract for May 1964 delivery of 20,000 bushels of soybeans. This contract was sold 6 weeks later on September 23, 1963, for a profit of $4,966.50. On October 7, 1963, only 2 weeks after that sale, petitioner purchased another 20,000 bushels of soybeans for May 1964 delivery and then 4 days later purchased an additional 20,000 bushels of soybeans for May 1964 delivery. At the time in 1963 that petitioner made these purchases the price of soybeans was rising *290 and because of his opinion that the price would continue to rise, petitioner was considering planting his entire farm in soybeans in 1964. Petitioner in both 1961 and 1963 made profits on purchasing May and July soybean futures as a speculation. In our view of the facts he continued his practice of making speculative purchases of soybean futures in October 1963 and January 1964. When the price of soybeans fell drastically in the spring of 1964 as a result, in petitioner's opinion, of the salad oil scandal, petitioner viewed his October 1963 and January 1964 purchases of futures in retrospect and concluded that because of what he considered to be an unusual event affecting the soybean market and the fact that prior to the drop in price of soybeans he had been considering planting his entire farm in soybeans, the loss resulting from closing out his October 1963 and January 1964 purchases of futures should be considered to be an ordinary loss, either as a 233 hedging loss or a loss from a business transaction in the nature of insurance. Considering all of the facts in this case we conclude that petitioner's purchases of soybean futures contracts in October 1963 and January 1964 *291 were speculative and that the losses petitioner sustained in 1964 from these transactions were capital losses. Decision will be entered for respondent. Footnotes
1. 10,000 bushels of May, Soybeans were sold 5-4-64 and 10,000 bushels of May, Soybeans were sold 5-5-64. ↩
2. 10,000 bushels of May, Soybeans were sold 5-18-64 and two transactions of 5,000 bushels of May, Soybeans were sold on 5-19-64. ↩
3. Two transactions of 5,000 bushels of July, Soybeans were sold 6-15-64. ↩
4. No bushel amounts were given for these two transactions.↩
1. See. 1221, I.R.C. 1954. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; ↩
2. Sec. 1233, I.R.C. 1954, which deals with gains or losses from short sales, including commodity futures, constituting in the circumstances therein listed capital gains or losses specifically provides in subsection (g) that "This section shall not apply in the case of a hedging transaction in commodity futures." In 1936 G.C.M. 17322, XV-2 C.B. 151 was issued. It states in part (at p. 155): * * * hedging transactions are essentially to be regarded as insurance rather than a dealing in capital assets within the comprehension of section 117 of the Revenue Act of 1934. Regardless of accounting or inventory methods in use, provisions pertaining to capital gains and losses govern gains or losses on futures contracts which are speculative. Futures contracts representing true hedges against price fluctuations in spot goods are not speculative transactions, though not concurrent with spot transactions. Futures contracts which are not hedges against spot transactions are speculative unless they are hedges against concurrent futures or forward sales or purchases. The principle of this G.C.M. has been accepted in numerous Court decisions. Estate of Dorothy Makransky, 5 T.C. 397, 412 (1945) and cases there cited, affirmed 154 F. 2d 59↩ (C.A. 3, 1946).